[No. A126239. First Dist., Div. Two. Jan. 11, 2011.]

HARDEV SINGH GREWAL, Plaintiff and Respondent, v.
AMOLAK SINGH JAMMU et al., Defendants and Appellants.

**COUNSEL**

Mark Cohen for Defendants and Appellants.

Njelita Law Offices and N. Maxwell Njelita for Plaintiff and Respondent.

**OPINION**

**RICHMAN, J.**—Plaintiff Hardev Singh Grewal, a 73-year-old interpreter for the Alameda County Superior Court and a 39-year resident of Fremont, is a

well-known member of the Sikh Temple, San Francisco Bay Area (Temple), who, he alleged, "enjoyed a good reputation . . . in the Temple and in his occupation." On two occasions in 2005 the Punjab Times published calumnious statements about plaintiff, and in 2006 he filed suit for defamation. The suit named several defendants, including Amolak Singh Jammu and A.B. Publication, Inc., the editor and publisher of the Punjab Times (when referred to collectively, the Jammu defendants). Another article followed this stating that plaintiff referred to the Temple school as a "madrassa," a training school for terrorists and students of the Taliban. This caused an amended complaint, and plaintiff's suit came to include four causes of action for libel.

The Jammu defendants filed a special motion to strike (anti-SLAPP) these causes of action, a motion that was noteworthy in several respects, in that it was filed (1) almost three years after plaintiff's original complaint; (2) despite that the Jammu defendants had filed verified answers to plaintiff's earlier complaints containing identical causes of action; and (3) despite that an earlier anti-SLAPP motion by three other defendants had been denied in an order expressly holding that plaintiff had a probability of prevailing. Beyond all that, the motion was scheduled to be heard five days before the date on which the case had long been set for trial.

Defendants' moving papers—a voluminous 206 pages, not including a request for judicial notice of thousands of pages of three Alameda County court files and the 54-page opinion by this court in *Singh v. Singh* (2004) 114 Cal.App.4th 1264 [9 Cal.Rptr.3d 4] (*Singh*)—argued that the causes of action involved an "issue of public interest." Plaintiff's opposition argued otherwise, an opposition that also showed that in any event there is a "strong likelihood that he will prevail on his claims. . . . [¶] . . . The published statements are provably false, caused plaintiff damages and defendants failed to use reasonable care in publishing the statements." That, plaintiff claimed, was "established." Defendants' reply did not disagree, acknowledging that "by denying or refuting the statements [that] plaintiff has taken issue with, at best he has merely put them at issue."

The trial court entered a detailed order concluding that the first three causes of action did not involve an issue of public interest and that plaintiff demonstrated a likelihood of prevailing on the fourth. The Jammu defendants appealed, as the anti-SLAPP statute gives them the right to do.

We review the matter de novo, and we affirm, doing so without adding to the burgeoning California jurisprudence as to what is, or is not, an "issue of public interest." For, such issue or not, plaintiff has met his burden under the anti-SLAPP statute—as the Jammu defendants essentially conceded. And we

affirm with the observation that, however efficacious the anti-SLAPP procedure may be in the right case, it can be badly abused in the wrong one, resulting in substantial cost—and prejudicial delay. It is time for plaintiff's case to be heard on the merits. Perhaps it is also time for the Legislature to revisit whether a defendant losing an anti-SLAPP motion has an absolute right to appeal.

## BACKGROUND

### The Sikh Temple and Its Governance

To put the matter in context, we begin with some historical background, much of which is from our opinion in *Singh, supra,* 114 Cal.App.4th 1264, which background begins in 1977, when the Sikh Temple was incorporated as a nonprofit religious corporation. (*Id.* at p. 1269.) Plaintiff was active in the founding of the Temple and in the early years was involved in its management, until 1983. Plaintiff has not been involved in the management of the Temple since 1984, though he remains a regular member and attends religious services there.

The early years after incorporation were apparently uneventful, but things began to change in the late 1980's, as issues arose concerning governance of the Temple, which issues continued for some years. This ultimately led to the first of several lawsuits, filed in August 1996. This lawsuit quickly settled, "when the parties agreed to a court-supervised election of the Supreme Council. That election occurred on December 22, 1996, and resulted in the election of five Supreme Council members . . . ." (*Singh, supra,* 114 Cal.App.4th at p. 1270.) In 1999, one member of the Supreme Council was involuntarily removed pursuant to the bylaws, and one Mota Singh was nominated and selected as a replacement by the congregation. Other than the filling of this vacancy, no elections for the Supreme Council were held between December 1996 and March 2002. (*Id.* at pp. 1270–1271.)

Meanwhile, in December 1998, a second lawsuit was filed, seeking declaratory and injunctive relief, and a receivership. Plaintiffs in that case "complained that there was an unlawful cancellation of a general election scheduled for December 20, 1998, by the defendants named in that case and the assumption of office by a new board of directors on December 6, 1998, without the benefit of an election." (*Singh, supra,* 114 Cal.App.4th at p. 1271.) This second lawsuit proceeded to a court trial in 1999.

Sometime later, issues apparently arose in connection with a March 2002 election. Following various meetings, one group remained as the Supreme Council and "refused to vacate," which led to lawsuit number three, filed in

April 2002, the lawsuit that gave rise to our 2004 decision in *Singh. (Singh, supra,* 114 Cal.App.4th at p. 1272.)

Apparently three lawsuits had no calming influence on some Temple members, and elections continue to generate intense feelings. And it was allegedly in connection with an upcoming January 2006 election that the Punjab Times published the materials leading to plaintiff's lawsuit here.

*Plaintiff's Lawsuit*

The complaint in issue is plaintiff's second amended complaint, filed on February 23, 2009, which we discuss in detail below. Before doing so, we recount some earlier developments in the case, many of which the parties have not discussed but which we piece together from entries in the register of actions and miscellaneous pleadings and papers put before us as exhibits or in requests for judicial notice.

Plaintiff's original complaint was filed on June 14, 2006, and named seven defendants: Devinder Singh, Sukhdev Singh, Avtar Singh, Harjinder Singh, Palwinder Singh, and the two Jammu defendants. The complaint alleged three causes of action, the first two for libel against all defendants, the third for slander against the five defendants with the surname Singh. The libel claims were based on two publications in the Punjab Times—plaintiff calls them articles, the Jammu defendants call them advertisements—one on June 18, 2005, and one on December 31, 2005. These claims remained in plaintiff's complaints throughout.

On March 2, 2007, defendants Sukhdev Singh, Avtar Singh, and Palwinder Singh filed an answer. Twelve days later, these same defendants filed a special motion to strike. That motion came on for hearing before the Honorable Winifred Smith who, by order dated April 30, 2007, denied the motion, concluding that "Plaintiff . . . has established a probability that he will prevail on his claims. (See [Code Civ. Proc., §] 426.16(b)(1).)[1] Put another way, plaintiff has demonstrated by competent evidence a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by him is credited. (See *Wilson v. Parker*[, *Covert & Chidester*] (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)"[2]

Meanwhile, and of significance here, on April 4, 2007, the Jammu defendants filed a verified answer to plaintiff's complaint.

---

[1] All further unspecified statutory references are to the Code of Civil Procedure.

[2] The three Singh defendants filed an appeal from the order denying their motion, which they voluntarily dismissed in April 2008.

In May 2007 plaintiff filed a motion for leave to file an amended complaint, which was granted, and a first amended complaint (FAC) was filed on June 29, 2007. The FAC added Gurmeet Singh Khalsa as a defendant, and alleged five causes of action, the same three as in the original complaint, a second libel claim based on the December 31, 2005 article, and an additional slander claim against Khalsa. As before, the Jammu defendants filed a verified answer, this time to a complaint that contained three of the four causes of action they would later attack by their motion to strike.

This answer was filed on August 10, 2007, and from that point on the register of actions contains references to substitutions of attorneys; a motion to be relieved as counsel (June 24, 2008); numerous case management statements; and an order of October 20, 2008, that the case was set for "Civil Jury Trial 7/6/2009." A flurry of trial-preparation-type motions followed, and then, for reasons unexplained in the record, on February 23, 2009, a "Second Amended Complaint [was] filed." This is the complaint in issue here.

The second amended complaint (SAC) named the same eight defendants as in the FAC: the five Singhs, the two Jammu defendants, and Khalsa. The SAC began with plaintiff's description of himself: "employed as a Court Interpreter for the Superior Court of California, with his place of employment in the County of Alameda. Plaintiff resides in the City of Union City, County of Alameda, California, and has resided there for 38 years. Plaintiff is also a well-known member of the Sikh Temple . . . (Temple). At all pertinent times, plaintiff has enjoyed a good reputation generally, in the Temple and in his occupation."

The SAC went on to identify defendants, alleging this about the Jammu defendants: that A.B. Publication is an Illinois corporation, doing business in Union City; that A.B. Publication publishes and circulates a weekly publication called the Punjab Times, which "has a wide circulation in California and other states, and is read by a great number of California persons and citizens of the areas in which it is published and circulated"; and that Jammu was the publisher and editor of the Punjab Times. While the SAC alleged seven causes of action, only four were against the Jammu defendants and thus pertinent here, and we describe only them.

**First Cause of Action**—Libel based on a June 18, 2005 article in the Punjab Times, attached as an exhibit. The article was described as "libelous on its face because, among other things, it accused plaintiff of committing a serious crime, of being unfit as a president of the Temple, of being divisive, dishonest and lacking in respect for the Sikh religion and baptism, and lacking in humility and integrity. Specifically, it stated that plaintiff admittedly went into hiding from the Temple in 1984, and only visited the Temple

secretly. . . . The article stated that plaintiff was against the Sikh religion, that he sided with forces out to destroy the Sikh nation, and that he does not believe in Sikh baptism. The article stated that plaintiff joined forces with a certain group in the forcible takeover of the Temple in 1996, and that thereafter he betrayed that group by joining forces with another opposing group. The article stated that plaintiff disrespected the Rehat Maryada Handbook (the Sikh Code of Conduct) by swinging and slamming it hard on the floor, and quipping: 'what is the use of keeping it now?' "

**Second Cause of Action**—Libel based on a December 31, 2005 article in the Punjab Times, also attached as an exhibit. This article, too, was "libelous on its face because, among other things, it accused plaintiff of committing the crimes of theft, embezzlement and tax fraud, of being unfit as a president of the Temple, of being divisive, dishonest and lacking in respect for the Sikh religion and baptism . . . . That article also suggested that plaintiff . . . desecrated the Sikh religion and Sikh baptism by precluding baptism from taking place at the Temple, permitting alcohol to be consumed at the Temple and by claiming that he would never marry his daughter to a Sikh. . . . The same article claimed that plaintiff used to improperly take Temple cash offerings home for his personal tax-deduction purposes; and that he used to charge members of the Temple for the car-parking fees he incurred during his personal errands to San Francisco."

**Third Cause of Action**—Libel, also based on the December 31, 2005 article, which is "libelous on its face because, among other things, it accused plaintiff, a Sikh, of being unscrupulous, vice-indulgent, and devoid of the Sikh way of life. Furthermore, the article stated that plaintiff exhibited total contempt for the Sikh's golden principles, and that he swung the code copy of the Rehat Maryada Handbook (the Sikh Code of Conduct), 'slammed it hard on the floor, and retorted "now, what is the need for this for us?" ' "

We pause to note that the first and second causes of action in the SAC are identical to those in the original complaint, and that the third cause of action is identical to that in the FAC. They were thus two of the causes of action as to which Judge Smith held that plaintiff had a probability of prevailing—and three of the causes of action to which the Jammu defendants had filed verified answers.

**Sixth Cause of Action**—Libel based on a May 24, 2008 article in the Punjab Times, also attached as an exhibit. This article is entitled *Very Serious Notice Taken of Hardev Grewal's Statement About Guru Granth Sahib*, and it is, plaintiff alleged, "libelous on its face because, among other things, . . . the article claimed that plaintiff, a Sikh, had described a Sikh school operated on the premises of the Fremont Sikh Temple . . . as a training

ground for fundamentalist terrorists. The article also claimed that plaintiff had described the students of the same school as the . . . same terrorist organization reportedly responsible for the September 11, 2001 terrorist attacks on the World Trade Center in New York. Specifically, the article stated that Plaintiff and his associates had described the Khalsa School operated on the Temple premises as a 'madrassa' (an Urdu term for School of Islamic Instruction) and its students as the 'Talibans.' . . ."

On April 15, 2009, the Jammu defendants filed their verified answer to the SAC, and seven days later the anti-SLAPP motion at issue here.

### The Anti-SLAPP Motion

On April 22, 2009, 58 days after the SAC was filed, the Jammu defendants filed a "Code of Civil Procedure § 425.16 Special Motion to Strike (Anti-SLAPP)"; it was set for hearing on July 1, 2009, five days before the scheduled July 6 trial date.[3] The motion to strike was supported by a 15-page memorandum of points and authorities, nine declarations (including one of counsel), and a request for judicial notice of the three Alameda County Superior Court files from the cases mentioned above and our decision in *Singh, supra*, 114 Cal.App.4th 1264.[4]

The points and authorities have no argument headings, so the Jammu defendants' precise argument(s) is (are) not easily determined. Indeed, the points and authorities—or, for that matter, the motion itself—do not even specify which of the four descriptions in section 425.16, subdivision (e) supposedly encompasses plaintiff's lawsuit. However, various assertions in the points and authorities appear in boldface, including this: "An issue of public interest comes under the anti-SLAPP suit protections of C.C.P. § 425.16 simply if the public is interested. The issue need not be significant. The Sikh Temple election with a membership of over 8,216 held a hotly contested election in 2005 and 2006 and bylaw amendment proposals in which the plaintiff was openly involved in. Has the plaintiff involved himself in an issue of public interest?"[5]

The Jammu defendants' own description of the matter, and their apparent position, reads this way: "**The ads and article that the plaintiff takes issue**

---

[3] Since the motion to strike was filed within 60 days of the SAC, it was timely under section 425.16. (§ 425.16, subd. (f).)

[4] The request for judicial notice did not comport with the requirements of the Rules of Court. (Cal. Rules of Court, rule 3.1306(c).)

[5] The points and authorities also boldface, without elaboration, that plaintiff "is a public figure," and that the Punjab Times is a newspaper "afforded the 1st Amendment protection in section 425.16." (Boldface omitted.)

**with**: The first three libel causes of action contained in the second amended complaint are based on three paid for advertisements which were published in the Punjab Times . . . . In reading these ads three themes immediately emerge: (1) These ads discuss a matter concerning the Sikh religion; (2) These ads are part of a debate over the administration of Fremont Sikh Temple and board of director elections; and (3) These ads concern the credibility of plaintiff who the writers of these ads obviously disagree with. [¶] A news article appeared in the Punjab Times on May 24, 2008 which attributed various statements and actions to the plaintiff . . . . The plaintiff, by virtue of the above entitled action, took exception to this article. The May 24th news article is the subject of the plaintiff's sixth cause of action. . . ."

We assume from this, an assumption confirmed at oral argument, that the Jammu defendants rely on section 425.16, subdivision (e)(4), which provides as follows: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The eight noncounsel declarations submitted in support of the motion refer to various events over the years concerning Temple elections and governance, and plaintiff's claimed participation. The Jammu defendants describe the thrust of the declarations this way: **"The Declarations submitted**: The declarations submitted all contain firsthand accounts of plaintiff Grewal's involvement in the politics and affairs of the Fremont Sikh Temple and establish the plaintiff's public figure status. . . . The declaration of defendant Jammu establishes the context in which the ads and articles were published and demonstrates the very important 1st amendment role that the Punjab Times and other news papers like his play within the Sikh community. The conclusion that can be drawn from Mr. Jammu's declaration is that to permit the plaintiff's lawsuit to continue would be [to] punish ethnic newspapers in their role of communicators of information within a religious community. [¶] Finally, what the case is really all about is a dispute centered on religion and the politics of an 8,126 member Sikh Temple."[6] Significantly, not one of the declarants attempted to show that any of the disparaging things said about plaintiff was true.

Plaintiff filed vigorous opposition, which included 20 declarations. One was from his counsel, which attached and authenticated numerous pleadings

---

[6] Plaintiff filed extensive objections to these declarations, some of which were ruled on, some not, and some of which objections were sustained. The effect of the sustained objections is not pertinent to our discussion, and we need not review the evidentiary rulings.

and documents. Eighteen were from colleagues, friends, and acquaintances, many of whom held executive positions in technology companies and, inferentially at least, had no vested interest in the dispute. These declarants testified at length about their interactions with plaintiff, his involvement in Temple matters, and his stellar reputation. Some declarants also testified—without objection—about the person who turned out to be the sole source of the publications, a person whose reputation was, according to this testimony, less than stellar. The 20th declaration was from plaintiff himself, who testified at length about his background, his family, his history at the Temple, the false things said about him, and their effect. All this will be set forth in detail in connection with the discussion showing that plaintiff met his burden under the anti-SLAPP law.

The Jammu defendants filed a 10-page reply. The first paragraph cited, without discussion, four cases they claimed supported that statements "published during the heat of election involving an 8,126 member Sikh Temple are . . . matters of public interest." The next two paragraphs asserted, without benefit of authority or citation, that plaintiff has not shown that he is not a public figure and that the Punjab Times is not a newspaper. And then the reply said this: "So what this motion really comes down to is whether the plaintiff has established a probability of prevailing. [¶] When sorting through all the verbiage and at times vitriolic rhetoric contained in the declarations submitted by the plaintiff all we have is a bunch of friends and political allies saying how nice a guy the plaintiff is. If anything, these declarations serve as evidence that establish the plaintiff's public figure status. [¶] The plaintiff has not established that the defendants acted with malice. The plaintiff has not established that the statements made in the articles were false. Rather by denying or refuting the statements the plaintiff has taken issue with, at best *he merely has put them at issue*. And putting the statements at issue is a far cry from establishing a prima facie case that would bring plaintiff a favorable judgment. . . ." (Italics added.)

The motion came on for hearing on July 1, 2009, before the Honorable Jo-Lynne Q. Lee. Judge Lee had published a tentative ruling denying the motion and, following brief argument, announced that the tentative ruling would be affirmed. Judge Lee thereafter entered a detailed order denying the motion, which order held in pertinent part as follows: "[T]he first three causes of action do not arise from Defendants' exercise of first amendment rights 'in connection with a public issue' or 'an issue of public interest.' (CCP § 425.16(b)(1), (e).) The alleged publications about Plaintiff were made in connection with elections to the board of a Sikh temple and disputes over its by-laws, both purely private matters within the temple's congregation." Judge Lee's order went on to thoughtfully distinguish the cases relied on by the Jammu defendants.

As to the sixth cause of action, Judge Lee held that as it involved a statement that the Temple school was an Islamic instruction school and referred to the Taliban, it did involve an issue of public interest. But, she went on, plaintiff met his burden with sufficient evidence.[7]

The Jammu defendants filed a timely notice of appeal.

## DISCUSSION

### The Anti-SLAPP Analysis

■ Essentially every case involving an appeal under the anti-SLAPP statute describes early in the discussion the two-step process for determining the case. *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958] is illustrative: "First, the court must determine 'whether the defendant has made a threshold showing that the challenged cause of action' arises from an act in furtherance of the right of petition or free speech in connection with a public issue. [Citation.] Second, the court must 'determine whether the plaintiff has demonstrated a probability of prevailing on the claim.' " And, of course, our determination is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

With relatively few exceptions, the cases then proceed to a determination of the first step: whether defendant made a threshold showing implicating the anti-SLAPP statute. These determinations typically—and understandably—involve many pages of analysis discussing the pertinent law, and then applying it to determine whether the complaint before the court does, or does

---

[7] While perhaps not necessary, Judge Lee conscientiously went on to note—and correctly—that defendants have "not shown that Plaintiff was a 'limited public figure' with respect to the publication, allegedly made in 2008. [Citation.] Here, Plaintiff presents evidence that he was not unusually active in temple politics, in general, in 2008, and that during that year he merely spoke, as an ordinary congregant, [at] a temple meeting and a meeting in a San Jose temple. Defendants' evidence, while potentially creating a dispute as to how active Plaintiff was, does not 'defeat' Plaintiff's evidence by demonstrating that, as a matter of law, Plaintiff voluntarily injected himself into a public controversy or sought to influence the resolution of some public issue, and that the imputed comment regarding the temple school was part of that controversy. [Citation.] As such, Plaintiff need not prove malice.

"For this cause of action, Plaintiff need only prove that Defendants published the article, that Plaintiff did not make the statement attributed to him, and that defendants failed to use reasonable care to determine the truth or falsity of the statements. (See CACI [No.] 1704; 5 Witkin Summ. Cal. Law (2008) § 627.) Plaintiff has submitted prima facie evidence supporting each of these elements. Defendants' evidence does not defeat Plaintiff's prima facie case. Moreover, Defendants' contentions regarding a printed retraction—assuming that a genuine retraction was printed—only go to the extent, not the existence, of Plaintiff's harm. (See Code Civ. Proc. § 48a; 5 Witkin Summ. Cal. Law (2008) § 629.)"

not, implicate the anti-SLAPP statute. And thus has developed a significant body of lengthy jurisprudence that has burdened—many would say overburdened—the courts of California.

We could write at length on the question whether the publications here concerned "an issue of public interest," and add to all this. And assuming we were to agree with Judge Lee's thorough analysis, we would affirm her decision on the first three causes of action.[8] That, of course, would still leave the sixth. We resist this temptation, and determine only step two: whether plaintiff met the burden imposed on him. And we easily conclude that he did.

### Plaintiff Met His Burden Under Section 425.16

We decide the second step of the anti-SLAPP analysis on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700 [61 Cal.Rptr.3d 29].)

That is the setting in which we determine whether plaintiff has met the required showing, a showing that is "not high." (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at p. 699.) In the words of the Supreme Court, plaintiff needs to show only a "minimum level of legal sufficiency and triability." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5 [97 Cal.Rptr.2d 179, 2 P.3d 27].) In the words of other courts, plaintiff needs to show only a case of "minimal merit." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675 [35 Cal.Rptr.3d 31], quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

---

[8] Which affirmance, though it would undoubtedly be lengthy, would probably not be difficult, as the statements were personal attacks on plaintiff, who was neither running in the election nor campaigning publicly in connection with it. The law is that there must be a public interest in the *specific speech or conduct alleged* in the complaint: " 'The fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute." (*World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570 [92 Cal.Rptr.3d 227]; see also *Episcopal Church Cases* (2009) 45 Cal.4th 467, 477 [87 Cal.Rptr.3d 275, 198 P.3d 66] [reversing trial court grant of anti-SLAPP motion, as church-related litigation involving property ownership was not protected activity; and confirming that " 'the critical consideration' " is whether the cause of action is *based* on " 'defendant's protected free speech or petitioning activity' "].)

■ As noted, the Jammu defendants conceded in their reply brief below that plaintiff's opposition put the matter "at issue," a concession that makes other descriptions of a plaintiff's burden in an anti-SLAPP motion even more apt. As the Supreme Court early on noted, the anti-SLAPP statute operates like a "motion for summary judgment in 'reverse.' " (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894].) Or, as that court would later put it, "Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation. [Citation.]" (*Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th at p. 192; accord, *Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [54 Cal.Rptr.3d 775, 151 P.3d 1185].)

Numerous Courts of Appeal have articulated the test in similar language. (See *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1062 [99 Cal.Rptr.3d 661] ["a standard 'similar to that employed in determining nonsuit, directed verdict or summary judgment motions' "]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317 [126 Cal.Rptr.2d 516] ["plaintiff's burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment"]; *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303] ["similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment"].)

Applying those descriptions here leads easily to the conclusion that plaintiff met his burden under the anti-SLAPP statute, in light of the applicable substantive law.

## The Substantive Law

■ As described above, the four causes of action pertinent here are for libel, defined as: "[A] false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which . . . has a tendency to injure him in his occupation." (Civ. Code, § 45; see *id.,* §§ 44, subd. (a), 45a.) To prevail on a claim for libel, plaintiff must show four elements: that defendants published the statements; that the statements were about plaintiff; that they were false; and that defendants failed to use reasonable care to determine the truth or falsity. (CACI No. 1704.)

Plaintiff's evidence showed that the first article, published June 18, 2005, was entitled *Few Words with [Plaintiff].* It asserted that from 1984 to 2002 plaintiff had "gone into hiding" and had visited the Temple only secretly, and wondered what kind of atrocities plaintiff had committed that forced him into seclusion. This article accused plaintiff of siding with traitors out to destroy

the Sikh nation; and claimed he had disrespected the Rehat Maryada Handbook or Sikh Code of Conduct by swinging it and slamming it hard on the floor. Plaintiff also submitted several declarations establishing that the statements and things attributed to him in this article were false.

The second article, published on December 31, 2005, and entitled *Some observations about [Plaintiff's] Golden Period*, was the basis of the second and third libel claims. The article falsely charged plaintiff with tax fraud, including that during his term as Temple president in the late 1970's, he took the cash offerings home for his own purposes. This article also asserted that plaintiff charged his personal parking fees to the Temple, and that he treated the Temple as a club, including by having alcohol served there, and called him "wretched, unscrupulous, vice-indulgent, and fun-loving." Again, plaintiff submitted declarations establishing that the things said about him in this article were false.

The fourth libel claim was based on the article published in May 2008, after this lawsuit was filed. This article stated that plaintiff referred to the Temple school as a "madrassa," a training school for terrorists and students of the Taliban. Plaintiff submitted evidence that he never made the statement, had demanded a retraction, and that the response in the Punjab Times was inadequate.

The above showing met plaintiff's burden as to the first three elements of his libel claims. As to the last element, lack of reasonable care, plaintiff presented evidence that before the Jammu defendants published the first of the articles, they knew plaintiff had a good reputation, a "positive standing" in the Sikh community, was indeed, a cofounder of, and influential member in, the Temple. Nevertheless, they published what they did. And based on what?

The evidence revealed that the content of the publications originated from a single source: Gurmeet Singh Khalsa. According to abundant evidence presented by plaintiff, Gurmeet Singh Khalsa had been charged with a criminal offense, arrested, and led from the Temple in handcuffs. He was also fired as the president of the Temple. In addition to that, there was Gurmeet Singh Khalsa's reputation within the Temple community, where he was variously described as a person with a "dishonest character and bad reputation," as a "conniving" person, as having a "criminal record for domestic violence," and as one who would readily spread false rumors to discredit anyone who did not agree with him.[9]

---

[9] Beyond the reputation evidence, plaintiff offered a concrete example: plaintiff testified that in 2004 Gurmeet Singh Khalsa had asked plaintiff to provide a false declaration stating that a political opponent of Singh Khalsa's had been seen drinking alcohol, a prohibited activity to a

■ In sum, in point-blank terms plaintiff testified that the many libelous statements "made against [him] are totally false and have no factual basis." They were, he said, "lies." And he was damaged by them. As he graphically described it at one point, "The defendants' allegations have resulted in irreparable harm to me and my family. Their false claims have been read and talked about by members of the Sikh community and received by many people as fact. Today my family and I cannot go out in public without receiving some accusatory glares from other members of the community. When I see some people talking in a group at social programs, I can't help think that they probably are talking about me. This is especially the feeling when I walk up to them and they stop their conversation. I just cannot take this hurt off my mind. I feel betrayed as I have been forever linked to these despicable lies. This incident has affected me and my family adversely. My children fail to understand why anybody would hurt their father so cruelly for the service he did so with dedication for the community. The lies were not just published facts, but were printed with a larger font, highlighted with solid black margins around them, and with a full photograph of the Temple, to ensure that the articles did not escape the attention of the reader."

The above shows that plaintiff met the burden imposed on him. And there is nothing in the Jammu defendants' briefs here that raises any question about that. Nothing. We nevertheless discuss these briefs, to demonstrate just how burdensome a misguided anti-SLAPP motion can be.

### *The Jammu Defendants' Briefs Miss the Point*

The opening brief of the Jammu defendants is 72 pages long. Following an abbreviated "Statement of the Case," the brief spends almost 21 pages on a "summary of facts," reciting the claimed facts from the Jammu defendants' perspective only, their "summary of [plaintiff's] evidence and declarations" consisting of a grand total of 20 *lines*. Such advocacy is not to be condoned. (See generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9-8 (rev. # 1, 2010) ["brief should *accurately and fairly* state the critical facts . . ."].) Beyond that, the brief is not well organized, and lacks any meaningful or logical argument headings, jumping from arguments referring to "issues of public interest" (arguments IV & V) to "free exercise of religion" (argument VI) to "limited public figure" (argument VII) to "public figure status" (arguments VIII, IX & X). The brief is, in a word, unhelpful.

The 66-page (!) reply brief is no better, with five arguments (some with multiple subparts) set forth with headings ranging from five lines to 13 lines.

baptized Sikh. Singh Khalsa explained to plaintiff that he needed the declaration in order to discredit the opponent to defeat him in an upcoming election. Plaintiff declined to provide the declaration.

Again, not commendable. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 9:107, p. 9-31 (rev. # 1, 2006), advising to "[k]eep headings short and concise.") These arguments jump too, from "free exercise" and "free exercise clause" (arguments II & III) to "public figure status" (argument IV) to "issues of public interest" (argument V).

But beyond these deficiencies, the briefs utterly fail to come to grips with the issue here.

The essential position of the Jammu defendants is this: the publications *were* an issue of public interest; and plaintiff *was* a public figure (or at least a limited public figure); and free exercise of religion *was* involved; and thus plaintiff had to prove malice. However quizzically worded, this is how the reply brief synthesizes it: "As the publications [plaintiff] complains of involved an act in furtherance of the exercise of free speech in connection with an issue of public interest, appellants contend that the publications are speech afforded the anti-SLAPP protections contained in Code of Civil Procedure § 425.16. But more importantly, by virtue of defamation or the exercise of speech being the gravamen of [plaintiff's] claims, anti-SLAPP protections necessarily apply provided it is in connection with an issue of public interest. [¶] Appellants further contend that the publications not only involve . . . an issue of public interest but as the content of the speech is entangled with matters of religion, the free exercise clause of the First Amendment is implicated. As such, at the very least, [plaintiff] must demonstrate appellants acted with malice. But due to the excessive entanglement of religion involved in [plaintiff's] claims, they may have to be dismissed in the first instance. [¶] Appellants also contend that at the least [plaintiff] is a limited public figure and in any instance, [plaintiff] failed to show that appellants acted negligently, let alone, with malice."

Our reaction? Disbelief. A few observations should suffice to explain why.

First, Judge Lee specifically held that the first three causes of action did not involve an "issue of public interest." But even if such an issue were involved, it is only the first of the two-step anti-SLAPP analysis. And as set forth above, the second step analysis is devastating to the Jammu defendants. They simply ignore it.

Second, Judge Lee (and for that matter Judge Smith before her) specifically held that plaintiff was not a public figure. An ipse dixit does not demonstrate otherwise.

Third, any claim of "free exercise of religion" or "excessive entanglement of religion" does not apply, as the sole case on which the Jammu defendants

rely expressly holds. That case is *McNair v. Worldwide Church of God* (1987) 197 Cal.App.3d 363 [242 Cal.Rptr. 823], which held that any special protection is afforded only to a defamation "made during the course of a doctrinal explanation by a duly authorized minister." (*Id.* at p. 377.) The publications here were not "doctrinal explanations," Jammu and the Punjab Times were not "ministers."

In short, plaintiff did not have to show malice. But even if he did, such could be present here, in light of the evidence that the Jammu defendants relied solely on Gurmeet Singh Khalsa, hardly a reliable source. There was evidence he had been charged with a criminal offense, arrested, and led from the Temple in handcuffs; that he had been fired as Temple president; and that he had a reputation within the Temple community as a "dishonest" person, a "conniving" person," and a person who would readily spread false rumors to discredit anyone with whom he disagreed. Reliance on such a person evidences malice. (See *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 640 [188 Cal.Rptr. 216] [charge of criminal conduct based on information from source hostile to plaintiff presented jury question whether there was reckless disregard of truth]; *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 278 [79 Cal.Rptr.2d 178, 965 P.2d 696].) Beyond all that, the Punjab Times published the articles in 16 states besides California, overpublication that is also evidence of malice. (*Rancho La Costa, Inc. v. Superior Court* (1980) 106 Cal.App.3d 646, 667 [165 Cal.Rptr. 347].)

Based on all the above, we conclude that Judge Lee properly denied the Jammu defendants' anti-SLAPP motion, a motion, we add, that should never have been brought, generating an appeal that, as shown, is utterly lacking in merit. Something is wrong with this picture.

### The Anti-SLAPP Statute: Its Purpose, Use, Misuse, and Abuse

Section 425.16, the anti-SLAPP statute, was enacted in 1992, with the following preamble: "(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. . . ." (Stats. 1992, ch. 726, § 2, p. 3523.)

The purpose of the statute was the subject of extensive discussion by our Division One colleagues, in *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883 [17 Cal.Rptr.3d 497], which began as follows: "**SLAPP Suits, and Legislative Response to SLAPP Suits** [¶] The court in *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809 [33 Cal.Rptr.2d 446] (disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685]), one of the first cases to apply anti-SLAPP legislation, explained:

" 'Litigation which has come to be known as SLAPP is defined by the sociologists who coined the term as "civil lawsuits . . . that are aimed at preventing citizens from exercising their political rights or punishing those who have done so." (Canan & Pring, Strategic Lawsuits Against Public Participation (1988) 35 Social Problems 506.) The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. [Citations.]

" 'The favored causes of action in SLAPP suits are defamation, various business torts such as interference with prospective economic advantage, nuisance and intentional infliction of emotional distress. [Citation.] Plaintiffs in these actions typically ask for damages which would be ruinous to the defendants. [Citations.]

" 'SLAPP suits are brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. [Citations.] Indeed, one of the common characteristics of a SLAPP suit is its lack of merit. [Citation.] But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective. [Citation.] As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the political arena is substantially diminished. [Citations.] . . .

" 'Thus, while SLAPP suits "masquerade as ordinary lawsuits" the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so. [Citation.]' " (*Wilbanks v. Wolk, supra*, 121 Cal.App.4th at pp. 890–891, italics omitted.)

The early cases were not consistent in interpreting the scope of the anti-SLAPP statute. (See generally *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1113 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*) [discussing the "divided" decisions of the Courts of Appeal].) Proponents of the anti-SLAPP procedure became concerned that the statute was being applied too narrowly, and sought legislative relief. This resulted in a 1997 amendment to section 425.16, which expanded the definition of activity " 'in furtherance of a person's right of petition or free speech' " to include "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." The 1997 amendment also added this last sentence to the preamble: "To this end, this section shall be construed broadly." (Stats. 1997, ch. 271, § 1, p. 1291.)

Shortly after this amendment, the Supreme Court decided *Briggs*, holding that an anti-SLAPP motion brought under section 425.16, subdivision (e)(1) and (2) did not need to show that the statement concerned an issue of public significance. Doing so, the court expressly relied on the newly added language that section 425.16 " 'shall be construed broadly.' " (*Briggs, supra,* 19 Cal.4th at p. 1119.) Interestingly—if not presciently—the majority opinion ends with the observation that "[i]f we today mistake the Legislature's intention, the Legislature may easily amend the statute." (*Id.* at p. 1123.) In dissent, Justice Baxter expressed concern that "[t]he majority's holding expands the definition of a SLAPP suit to include a potentially huge number of cases, thereby making the special motion to strike available in an untold number of legal actions that will bear no resemblance to the paradigm retaliatory SLAPP suit to which the remedial legislation was specifically addressed." (*Id.* at p. 1129 (conc. & dis. opn. of Baxter, J.).)

Whatever the reason, concern quickly galvanized in the direction that the anti-SLAPP statute was being misused. This concern immediately made its way to the Legislature, which in the 1999–2000 session, passed a bill precluding application of the anti-SLAPP statute to purely consumer interest actions. But Governor Davis vetoed the bill. This concern was resurrected in the 2003–2004 session, in Senate Bill No. 515 (2003–2004 Reg. Sess.),[10]

[10] Among the people writing in support of Senate Bill No. 515 (2003–2004 Reg. Sess.) was Penelope Canan, one of the two law professors whose work was the basis for section 425.16. Professor Canan's letter read in pertinent part as follows: " 'Anti-SLAPP legislation is intended "to provide citizens who are sued for speaking out with a speedy and relatively inexpensive defense mechanism against attacks on their First Amendment rights by SLAPPs." [¶] How ironic and sad, then, that corporations in California have now turned to using meritless anti-SLAPP motions as a litigation weapon. This turns the original intent of one of the country's most comprehensive and effective anti-SLAPP laws on its head.' " (Arkin, *Bringing California's Anti-SLAPP Statute Full Circle: To Commercial Speech and Back Again* (2003–2004) 31 W. St. U. L.Rev. 1, 22 (Arkin).)

which passed, and became the new Code of Civil Procedure section 425.17, which begins with this observation: "The Legislature finds and declares that there has been a disturbing abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." (Stats. 2003, ch. 338, § 1.)

Concern that the anti-SLAPP procedure was being abused also extended to the courts, where various justices expressed the concern in various ways. Comments in three cases illustrate the point.

*Navellier v. Sletten, supra,* 29 Cal.4th 82, involved the issue whether a defendant's having filed counterclaims in a prior, unrelated proceeding in federal court was one arising from "protected activity." (*Id.* at p. 85.) A divided Supreme Court held that it was. Claiming that such holding was an unwarranted expansion of the anti-SLAPP law, dissenting Justice Brown, writing for herself and Justices Baxter and Chin, asserted that the majority's "presumptive application of section 425.16 will burden parties with meritorious claims and chill parties with nonfrivolus ones." And she added this flourish: "The cure has become the disease—SLAPP motions are now just the latest form of abusive litigation." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 96 (dis. opn. of Brown, J.).)

*Moore v. Shaw* (2004) 116 Cal.App.4th 182 [10 Cal.Rptr.3d 154] was a defendant's appeal from the denial of an anti-SLAPP motion. The Court of Appeal affirmed and, holding that the motion was frivolous, reversed the trial court's denial of attorney fees to the plaintiff. Doing so, Presiding Justice Klein ended with this: "We cannot help but observe the increasing frequency with which anti-SLAPP motions are brought, imposing an added burden on opposing parties as well as the courts. While a special motion to strike is an appropriate screening mechanism to eliminate meritless litigation at an early stage, such motions should only be brought when they fit within the parameters of section 425.16." (*Id.* at p. 200, fn. 11.)

*Moran v. Endres* (2006) 135 Cal.App.4th 952 [37 Cal.Rptr.3d 786] was an appeal by the defendants who had been denied attorney fees, which defendants had prevailed in obtaining dismissal of only "one of many causes of action" (*id.* at p. 953), and that for conspiracy, which is not a cause of action in any event. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Affirming the denial of attorney fees, an exasperated Justice Armstrong observed: "Section 425.16 was enacted because the Legislature found that 'it is in the public interest to encourage continued participation in matters of public significance,

and that this participation should not be chilled through abuse of the judicial process.' Neither the public's nor defendant's right to participate was advanced by this motion." (*Moran v. Endres, supra,* at p. 955.) A concurring Justice Mosk added this: "Code of Civil Procedure section 425.16 . . . has resulted in numerous appeals that involve various ambiguities and apparent unintended consequences." (*Id.* at p. 956 (conc. opn. of Mosk, J.).)

Meanwhile, commentators were also writing on the explosion of anti-SLAPP motions, claiming to support their conclusions with counts and statistics. An early example said this: "The statute went from a little-used statutory protection for environmental and other protestors to a . . . veritable explosion in appellate court decisions dealing with the statute. Between 1992, when the statute was first enacted, and January 1, 2000 there were only 34 published appellate decisions on the statue. But between January 1, 2000 and September 25, 2003, there were 184 published and unpublished decisions. Of those decisions, 148 have been rendered from September 25, 2002 to September 25, 2003." (Arkin, *supra,* 31 W. St. U. L.Rev., at p. 2, fns. omitted.)[11]

We have attempted no such case count ourselves, but have reviewed the annotations to section 425.16 in West's Annotated California Code of Civil Procedure which we find revealing indeed: the annotations for the *12-year period* between 1992 and 2004 are 82 pages, an average of six-plus pages per year; the annotations for the *five-year period* between 2005 and 2009 are 107 pages, an average of 20-plus pages per year. And no letup seems in sight, as one cannot pick up a volume of the Official Reports without finding an anti-SLAPP case. Or four. (See 177 Cal.App.4th at pp. 471, 940, 1049, 1264.) This, of course, is just the published opinions.

There is precise evidence of this explosion in the record of anti-SLAPP filings that the Judicial Council is required to keep in accordance with the express directive of subdivision (j)(1) of section 425.16.[12] That Judicial

---

[11] In 2005, Presiding Justice Ruvolo summarized the effect of this in a scholarly journal: "it is no wonder that in the last several years, California appellate courts have been inundated with appeals involving the granting or denial of [anti-SLAPP] motions." (Ruvolo, *Appellate Mediation—"Settling" the Last Frontier of ADR* (2005) 42 San Diego L.Rev. 177, 196, fn. 49.)

[12] This subdivision provides as follows: "(j)(1) Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees."

Council record shows the following filings of anti-SLAPP motions since 1999: 1999—55; 2000—327; 2001—302; 2002—543; 2003—587; 2004—542; 2005—515; 2006—598; 2007—508; 2008—555; and 2009—558.[13]

The reason(s) behind this explosion are not necessarily germane to our discussion, and thus we offer nothing on the subject save this. A well-known saying, generally attributable to William Gladstone, is that "Justice delayed is justice denied." A lesser known saying, known to be attributable to prominent defense lawyers from major law firms, is that "Justice delayed is justice." Maybe it is that simple. Maybe not.

What is germane to our discussion is the ways in which the anti-SLAPP procedure is being misused—and abused. Without attempting to describe all the ways, we offer two examples, one obvious, one not.

The obvious example is found in the numerous cases that involve complaints that simply do not "arise from" protected activity, but generate anti-SLAPP motions nevertheless. Examples include actions against attorneys. (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1539 [52 Cal.Rptr.3d 712] [" 'garden variety' attorney malpractice"]; *Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179, 1187 [20 Cal.Rptr.3d 621] [duty of loyalty]; *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 630 [7 Cal.Rptr.3d 715]; *Moore v. Shaw, supra*, 116 Cal.App.4th 182 [breach of trust]; *Beach v. Harco National Ins. Co.* (2003) 110 Cal.App.4th 82 [1 Cal.Rptr.3d 454] [failure to timely arbitrate].) And personal injury claims. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 193 [6 Cal.Rptr.3d 494] ["garden-variety personal injury claims" against dietary product manufacturer].) And insurance coverage cases. (*State Farm General Ins. Co. v. Majorino* (2002) 99 Cal.App.4th 974, 975 [121 Cal.Rptr.2d 719] [declaratory relief action to resolve coverage issues].)

But another, and more subtle, abuse can be found in a case where the defendant could in good faith claim that the plaintiff's action arose from protected activity, and thus could meet the burden under step one of the anti-SLAPP analysis. But as seen, that is only the beginning. And suppose further that the defendant (or the defendant's attorney) knows that the plaintiff could meet the burden under step two. The defendant nevertheless files the anti-SLAPP motion, knowing that it will cause the plaintiff to expend

---

[13] The figures cited are distilled from spreadsheets provided by the Executive Office Programs Division of the Administrative Office of the Courts.

thousands of dollars to oppose it, all the while causing the plaintiff's case, and ability to do discovery, to be stayed. Would this not constitute a misuse of the procedure? But even if it might not in the abstract, might it not here, where an earlier anti-SLAPP motion had been denied, the court expressly holding that plaintiff had met his burden under step two—a holding, not incidentally, made against three defendants who, unlike the Jammu defendants, were *not even the publishers of the articles.* We would say that this filing alone would be an abuse. And certainly when followed by the abuse coup de grâce—the appeal.

### A Losing Defendant's Right to Appeal Is the Aspect of the Anti-SLAPP Statute Most Subject to Abuse

As originally enacted, section 425.16 made no reference to appeal (though obviously a losing plaintiff whose case was stricken could appeal any judgment of dismissal). In 1999 subdivision (j) was added to the statute, providing that "[a]n order granting or denying a special motion to strike shall be appealable under Section 904.1."[14] (Stats. 1999, ch. 960, § 1, p. 6956.)

The legislative history leading to subdivision (i) is not particularly illuminating, as shown by the brief discussion in the Senate Judiciary Report, which reads in its entirety as follows: "1. <u>Stated need for legislation</u> [¶] According to the proponents, this bill would further the purpose of the anti-SLAPP statute by allowing the defendant to immediately appeal a denial of a special motion to strike. Without this ability, a defendant will have to incur the cost of a lawsuit before having his or her right to free speech vindicated. [¶] The proponents contend that when a meritorious anti-SLAPP motion is denied, the defendant, under current law, has only two options. The first is to file a writ of appeal [*sic*], which is discretionary and rarely granted. The second is to defend the lawsuit. If the defendant wins, the anti-SLAPP statute is useless and has failed to protect the defendant's constitutional rights. The proponents assert that since the right of petition and free speech expressly granted by the U.S. Constitution are at issue when these motions are filed, the defendant should have the immediate right to appeal and have the matter reviewed by a higher court. [¶] The author is submitting amendments in Committee to clarify that the right of appeal would apply to motions granted or denied in order to assure that both the plaintiff and defendant are

---

[14] Section 904.1 was amended so that it provided, "(a) An appeal, other than in a limited civil case, is to the court of appeal. An appeal, other than in a limited civil case, may be taken from any of the following: [¶] . . . [¶] (13) From an order granting or denying a special motion to strike under Section 425.16." (Stats. 1999, ch. 960, § 2, p. 6958.)

given equal rights to appeal an adverse order." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1675 (1999–2000 Reg. Sess.) as amended May 28, 1999, pp. 3–4.)

The right of a defendant to appeal a losing anti-SLAPP motion quickly became, like so much else of the anti-SLAPP procedure, the subject of criticism. Indeed, such criticism was acknowledged by the Legislature itself in 2003 when, in discussing Senate Bill No. 515 (2003–2004 Reg. Sess.), the Senate Judiciary Committee noted the claim by the proponent of the bill "that current law is being used by defendants to unreasonably delay a case from being heard on the merits, thus adding litigation costs and making it more cumbersome for plaintiffs to pursue legitimate claims. . . . The filing of the meritless SLAPP motion by the defendant, even if denied by the court, is instantly appealable, which allows the defendant to continue its unlawful practice for up to two years, the time of appeal." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 15.) As enacted, section 425.17 expressly states that if a motion is denied based on that section, "the appeal provisions . . . of Section 425.16 . . . do not apply . . . ." (§ 425.17, subd. (e).) Unfortunately, section 425.16 was left untouched.

The concern about possible abuse of a losing defendant's right to appeal caught the attention of the Supreme Court in *Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th 180. While holding that the defendant's appeal stayed all proceedings in the trial court affecting the merits of the case, the court recognized the opportunity for abuse: "In light of our holding today, some anti-SLAPP appeals will undoubtedly delay litigation even though the appeal is frivolous or insubstantial. As the Court of Appeal observed and plaintiffs contend, such a result may encourage defendants to 'misuse the [anti-SLAPP] motions to delay meritorious litigation or for other purely strategic purposes.' " (*Id.* at p. 195.)

Commenting on this in *Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 283–284 [35 Cal.Rptr.3d 909] (*Olsen*), Justice Sims observed as follows: "Both the Legislature and the Supreme Court have acknowledged the ironic unintended consequence that anti-SLAPP procedures, enacted to curb abusive litigation, are also prone to abuse. As to abuse occasioned by the stay of proceedings on appeal of the denial of an anti-SLAPP motion, the Supreme Court has 'encouraged' us 'to resolve these . . . appeals as expeditiously as possible. To this end, reviewing courts should dismiss frivolous appeals as soon as practicable and do everything in their power to " 'prevent . . .

frustration of the relief granted.' " ' [Citation.]" (Fns. omitted.) Notwithstanding our great respect for Justice Sims, such dismissal is easier said than done.

*Olsen* involved an appeal that claimed that the trial court abused its discretion in denying an anti-SLAPP motion that was clearly untimely, an appeal, Justice Sims rightly concluded, that indisputably had no merit. However, while ultimately dismissing the appeal, Justice Sims first recognized the "general rule" that a motion to dismiss should never be granted if ruling on the motion "requires a consideration of the merits." (*Olsen, supra,* 134 Cal.App.4th at p. 284, fn. 5, citing *Reed v. Norman* (1957) 48 Cal.2d 338, 342 [309 P.2d 809].) "The general rule is grounded on policies of avoiding double work by this court and avoiding unwarranted advancement of the case on calendar. (See 9 Witkin, Cal. Procedure [(5th ed. 2008)] Appeal, §§ [747–748], pp. [811–812].) The Supreme Court's admonition for dispatch in *Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th 180, warrants an exception from the general rule here." (*Olsen, supra,* 134 Cal.App.4th at p. 284, fn. 5.) From there, Justice Sims went on to grant the motion to dismiss the appeal because it was "frivolous." (*Olsen, supra,* 134 Cal.App.4th at p. 280.)

Not all cases are so easily disposed of, especially if dismissal cannot be done without some meaningful analysis of the merits. And therein lies the rub. What to do? Eliminating a losing defendant's right to appeal is certainly one solution. And, we urge, one that should seriously be considered by the Legislature, especially as it would not necessarily leave the defendant without recourse.

In those relatively rare circumstances where a trial court has *clearly* erred in denying a meritorious anti-SLAPP motion, relief might be obtained by a writ, as it has been in similar circumstances where an appeal does not lie. (See, e.g., *West Shield Investigations & Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935 [98 Cal.Rptr.2d 612] [denial of summary adjudication; mandate ordering grant of motion]; *Babb v. Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379] [order overruling demurrer; mandate to sustain demurrer without leave to amend]; *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 304 [90 Cal.Rptr. 345, 475 P.2d 441] [order striking strict liability inverse condemnation count; mandate compelling reinstatement]; *Fair Employment & Housing Com. v. Superior Court* (2004) 115 Cal.App.4th 629, 633 [9 Cal.Rptr.3d 409] [mandate to vacate order overruling demurrer]; *American Internat. Group, Inc. v. Superior Court* (1991) 234 Cal.App.3d 749, 755 [285 Cal.Rptr. 765] [writ review entertained following denial of judgment on the pleadings].) But even if a writ were not obtained, the defendant could quickly move for summary judgment, as the primary

basis on which a defendant should prevail—and thus, where the trial court has clearly erred—is generally a legal question, such as where the litigation privilege applies.

We recognize the observation by Presiding Justice Sills in *People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317–1318 [9 Cal.Rptr.3d 844], commenting on the defendant's right to appeal a denial of an anti-SLAPP motion: "The right to appeal has a certain logic to it. After all, what use is a mechanism to allow you to get out of a case *early* if it is undercut by an erroneous decision of the trial judge? The point of the anti-SLAPP statute is that you have a right *not* to be dragged through the courts because you exercised your constitutional rights. The right to appeal a denial of an anti-SLAPP motion is important because it protects the interest validated by the anti-SLAPP statute."

After describing that right as "important," Justice Sills went on to observe that "the right to appeal has its own consequences. As we write, at least one appellate court has drawn the correlative conclusion that an appeal from the denial of anti-SLAPP motion also *stays* proceedings in the trial court. [Citation.] You don't just get the right to go to the appellate court, you also get a free time-out in the trial court." (*People ex rel. Lockyer v. Brar, supra,* 115 Cal.App.4th at p. 1318.) And from there he went further—to dismiss the appeal as frivolous. (*Ibid.*)

We do not disagree that the right to appeal can be "important." But it should not trump all else. And a losing defendant's "loss" of the right to appeal a lost anti-SLAPP motion, we submit, is a much smaller price to pay than a winning plaintiff having to expend thousands of dollars in attorney fees on appeal, while the plaintiff's case is stayed for anywhere from 19 to 26 months,[15] all in a setting where the original motion was without merit, if not downright frivolous.

It is now almost five years since plaintiff filed his lawsuit, and trial is not yet in sight. Such delay hardly seems defensible, particularly when it is due in no small part to nonmeritorious appeals by defendants who lost anti-SLAPP motions, the first appeal voluntarily dismissed after languishing for a long period (see fn. 2, *ante*), and this appeal rejected as utterly without merit. As we said, something is wrong with this picture, and we hope the Legislature will see fit to change it.

---

[15] See Judicial Council of California, 2010 Court Statistics Report, Statewide Caseload Trends, 1999–2000 Through 2008–2009, page 17.

## DISPOSITION

Judge Lee's order denying the motion to strike is affirmed. Plaintiff shall recover costs.

Kline, P. J., and Haerle, J., concurred.