Filed 9/3/14  USAA Federal Savings Bank v. Soldis CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| USAA FEDERAL SAVINGS BANK,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SOLDIS,<br><br>        Defendant and Appellant. | A138746<br><br>(Sonoma County<br>Super. Ct. No. SCV-252561) |

Appellant Joseph Soldis (Soldis) and respondent USAA Federal Savings Bank (usually, the Bank) have a long and checkered history.  It began in 1998, when Soldis opened his first checking account at the Bank.  Soldis overdrew the account, but did not pay it back, and in 2002 the Bank "charged off" the debt—though the debt remained on the Bank's books.  Soldis opened another account with the Bank, and again overdrew it, leading to a dispute about whether the Bank could set off the prior debt, a dispute that apparently was resolved.  In April 2012, Soldis opened yet another account with the Bank, with an initial deposit of $50, which the Bank applied as an offset to Soldis's debt. In July 2012, Soldis sent a letter to USAA, asserting that the matter had already been settled, and making demands on the Bank, and that it release his debt.  This lawsuit followed.

The bank filed a one-count complaint for declaratory relief, alleging this essential dispute:  "A dispute and an actual controversy has arisen and now exists between USAA FSB and Soldis as to the respective rights, duties and obligations of the parties under and by virtue of the terms, limitations, conditions, and provisions of the Depository

1

Agreement, in that USAA FSB contends that it is entitled to a setoff due to overdrawn funds, while Soldis disagrees with this assessment." Soldis filed an anti-SLAPP motion, asserting that the Bank's lawsuit was based on protected activity, his letter to the Bank. The trial court denied the motion, concluding that the Bank's suit was not based on protected activity. We reach the same conclusion, and we affirm.

## BACKGROUND

### The Bank's Complaint

On October 23, 2012, the Bank filed a complaint for declaratory relief against Soldis. The complaint was six pages long, and asserted one cause of action, based on eight essential paragraphs, alleging the following facts:

"The Depository Agreement

"4. Soldis and USAA FSB entered into a banking relationship governed by, inter alia, a Depository Agreement. At all times relevant herein Soldis was aware, or should have been aware in the normal course, of the terms of the Depository Agreement, his obligations, and USAA FSB'S rights under the Depository Agreement. . . .

"5. At all relevant times mentioned herein the Depository Agreement was in full force and effect. . . .

"6. Within the Depository Agreement is a section entitled Changes to Agreement. This section states, in pertinent part, as follows:

"Bank may change this agreement at any time, whether by adding new terms and conditions, or deleting or amending existing ones. . . . If you do not agree with a change, you may close your account. However, if you continue to use your account or keep it open, you accept and agree to the change. The current version of this Agreement supersedes all prior versions and contains the terms governing your account.

"7. Also, within Depository Agreement is a section entitled 'Charging an Account.' This section states, in pertinent part, as follows:

"*Bank may deduct fees, overdrafts, and other amounts you owe to Bank from your accounts with Bank or from your accounts with Bank's affiliates. Bank may make such deductions at any time and without prior notice to you or request from you.* If there are

2

not enough funds in the account to cover amounts owed to Bank, Bank may overdraw your account. You agree to pay immediately all amounts you owe Bank. Bank may use deposits you or others make to your account, including any Federal or state benefit payments that you choose to deposit in any account (including direct deposit of Social Security benefits) to pay fees, overdrafts and other amounts you owe Bank. You understand and agree that if you do not want your benefits applied in this you may change your direct deposit instructions to the benefits payor at any time. This provision does not apply to any consumer credit accessed by a credit card. (Emphasis added.)

"8. Still further within the Depository Agreement it states, in relevant part, as follows:

"Overdrafts and insufficient Fund Fees

"When you do not have enough available funds in your account to cover a check or other item . . . Bank considers the item an insufficient fund item. Bank may, without notice to you and in it [*sic*] sole discretion, either pay such items and overdraw your account, or decline or return such items unpaid. In either case, Bank may charge for each insufficient funds item and for each overdraft. . . . [¶] If Bank overdraws your account to pay an insufficient funds item, you agree to repay Bank immediately, without notice or demand from Bank. Bank may use subsequent deposits or credits to the account, including without limitation deposits of government, welfare, retirement, and social security benefits, to pay any overdraft you owe the bank, to the fullest extent permitted by law. You understand and agree that if you do not want such benefits applied in this way, you may change your direct deposit instructions to the benefits payor at any time. . . . [¶] *Bank may cover any over draft by debit to any other checking, savings, or time deposit account of any account holder without notice to the account holder*, but Bank is not obligated to do so. *You agree to pay all costs and expenses, including attorney's fees, that Bank incurs in the collection of any overdraft.* (Emphasis added.)

"9. Finally, within the Depository Agreement it states, in relevant part, as follows:

3

"Setoff and Security Interest

"*You agree that Bank may, without prior notice or demand, apply or setoff the funds in your account (and accounts you own with others) at any time to pay any debt, whether direct, or indirect, that you have with Bank, and/or any fees or service charges owed to Bank. In addition to its rights under the law (called setoff), you grant bank a security interest in each account to secure such debt; as it may arise. . . . [¶] . . . Bank may charge any such debt against your account at any time, without regard to the origin of deposits to the account or beneficial ownership of the funds.* (Emphasis added.)

"The Dispute

"10. USAA FSB is informed and believes; and on that basis alleges, that Soldis has had, and still does, maintain various accounts with USAA FSB. One of the accounts that was previously used by Soldis included a checking account that was opened on or about December 17, 1998. This account became overdrawn due to the conduct of Soldis. The negative balance was approximately $4,214.30. Soldis never made any arrangements to pay off this amount due and owing to USAA FSB.

"11. Thereafter, pursuant to its rights under the Depository Agreement, in 2012, USAA FSB partially setoff approximately $50 of the sums Soldis owed to USAA FSB. Soldis continues to owe USAA FSB on his overdrawn accounts.

"12. On or about July 5, 2012, Soldis sent a 'Demand for Payment from USAA FSB' to USAA FSB. Within that document Soldis contends—contrary to the Depository Agreement and controlling law—that USAA FSB did not, and does not, have the authority to setoff the sums as it did from one of his accounts with USAA FSB. He thereafter demands various sums from USAA FSB."

**The Anti-SLAPP Motion**

On February 15, 2013, Soldis filed a demurrer to the complaint. And on March 11, he filed the motion pertinent here: a special motion to strike pursuant to Code of Civil Procedure section 425.16 (SLAPP or anti-SLAPP). Both the demurrer and SLAPP motion were set for hearing on April 10.

4

The SLAPP motion was accompanied by a lengthy memorandum of points and authorities and a declaration of Soldis. Soldis's declaration attached six exhibits referenced in his declaration, setting forth the history of his relationship with the Bank, as seen by him. Thus Soldis testified as follows:

"2. On or about July 5, 2012, I sent a 'Demand for payment from USAA FSB' to USAA FSB.

"3. My demand letter was, on its face, a communication preparatory to or in anticipation of bringing a legal action. The July 5, 2012 demand letter specifically recites the history of my alleged debt to USAA, explains that the matter was resolved in 2003 through a lawsuit and settlement with USAA, and states that unless USAA walks away from its collection efforts and acknowledges the prior settlement, I would file a small claims action. Attached to the July 5, 2012 letter was a draft copy of this complaint. Attached hereto, and incorporated herein Exhibit A is a true and correct copy of my demand letter and the incorporated, draft complaint.

"4. It is my belief, as set forth below, and in my demand letter, that USAA is simply attempting to reassert a debt it walked away from over ten years ago. The following traced the history between me and USAA:

"5. On November 22, 2002, I filed a small claims action in the Sonoma County Superior Court, entitled *Soldis v. USAA Mortgage*, designated by case no MSC 163078. . . .

"6. Over a period of many months (perhaps over a year) prior to my filing MSC 163078, counsel for USAA and I had been exchanging communications in an attempt to negotiate the settlement of what USAA alleged was a debt I owed USAA in the amount of $4,214.30 due an improper failure by USAA to properly credit payments on a condominium . . . I had financed through USAA.

"7. On January 2, 2003, USAA, through its counsel, proposed settlement terms, pursuant to which for a payment of $5,000 (modified to $5,300) to me, from USAA, I would file a request for dismissal with prejudice of MSC 163078. This settlement was executed on January 3, 2003. . . .

"8. On January 13, 2003, USAA remitted payment to me. . . .

"9. On January 15, 2003, MCV 163078 was dismissed with prejudice. . . .

"10. My banking relationship with USAA dates back to sometime around 1988, when I financed the condominium I purchased in Sebastopol. In order to facilitate automatic payments, I opened a checking and savings account, through which I understood that as long as I kept my accounts adequately funded, USAA would use my deposits to make automatic transfers to make interest and principal payments on his USAA mortgage.

"11. During the first nine months of the mortgage loan's existence, I made regular deposits into the USAA account. However, USAA apparently lost several deposits— later discovered and admitted to—and erroneously charged my mortgage account with late notices and indications that my mortgage was unpaid, despite USAA's having made withdrawals from my checking account and credited itself with his payments.

"12. I had multiple phone conversations with USAA personnel in an effort to track down payments. USAA consistently advised me not to worry, and confirmed that monthly mortgage payments had been made. . . .

"13. Finally, in 2002, despite assurances that my loan was being paid, and regular deposits and automatic transfers having been made, I was served with a notice of intent to foreclose, based on an alleged failure to pay. Despite repeated efforts, I was unable to contact anyone at USAA to resolve this issue, and so, on November 22, 2002, I brought the small claims lawsuit against USAA and PHH Mortgage for $5,000 . . . .

"14. Following service of the lawsuit on USAA/PHH, USAA discovered its error and the Office of the President of USAA contacted me to apologize, telling me, 'to err is human and to recover is divine.' I informed USAA that I was refinancing my loan with another lender, in order to avoid foreclosure, and that it was going to cost me $7,000 in refinancing fees. About a week prior to trial, USAA/PHH attorney, Kristina M. Larise, contacted me and offered to settle for a one-time payment of $5,300.00, but if I refused to settle USAA would move the case into federal court. . . .

6

"15. I settled with USAA for a lump sum of $5,300. I asked USAA/PHH to conduct a final accounting, as neither I nor USAA were able to determine the status of my account at that point. USAA issued me a refund check, and soon thereafter I closed all accounts I had with USAA.

"16. Within around a year of closing my accounts, I opened a new checking account with USAA—I chose to do this because I appreciated that USAA accounts had a no-fee ATM policy. There was no problem for over a year, until I opened a new savings account with USAA. Within days of opening the savings account, USAA seized my accounts and informed me that I had an outstanding debt of around $4,000 from my prior checking account(s) dating back to the 2003 settlement of the small claims lawsuit.

"17. At that time, I threatened to sue, referencing the small claims lawsuit and its settlement in 2003. USAA's Assistant Vice President wrote to me on November 1, 2005, and explained that the reason my assets were seized was that USAA's records indicated that USAA had 'charged off with a $4,214.30 balance on January 17, 2002.'. . .

"18. The $4,214.30 'charge-off' is the exact same amount alleged as owing in the Complaint in the instant matter. The date (January 17, 2002) is conspicuously similar to the date of the Dismissal of MSC-163078, (January 15, 2003) and it is notable that counsel for USAA dated her Settlement agreement January 2, 2002, rather than 2003.

"19. To the best of my knowledge, beside the alleged non-payment of my mortgage, resolved in the 2003 settlement, I have never once been notified of any other overdraft or other failure to USAA. I never wrote a check on insufficient funds, and USAA has never informed me of any such overdraft.

"20. In July, 2012, I contacted Mr. Broker, attorney for USAA, who informed me that there were no outstanding issues with my accounts. In reliance on this assurance, I opened a new checking account and deposited $50.00. When, in 2012, USAA once again attempted to seize moneys from my USAA accounts, I engaged in a series of oral and written communications with USAA to define and resolve their dispute. Once I became certain that the basis for USAA's activities was the alleged $4,214.30 that was settled in the lawsuit and its resolution in 2003, and unable to resolve the matter with USAA, I

7

prepared my July 5, 2012 demand letter . . . specifically reciting the history of my alleged debt to USAA, that the matter was resolved in 2003 through a lawsuit and settlement with USAA, and stating that unless USAA walked away from its collection efforts and acknowledged the prior settlement, I would file a small claims action."

On March 27, the Bank filed its opposition to the SLAPP motion (and opposition to the demurrer). The Bank's opposition to the SLAPP motion was accompanied by a declaration of counsel, which attached as exhibits three documents obtained from Soldis's attorney. The Bank's opposition was also accompanied by the declaration of Bank employee Susie Donohue, attached to which were five exhibits. The Bank also filed objections to portions of Soldis's declaration.

On April 9, 2013, Soldis filed a reply memorandum and objections to portions of the Donohue declaration.

The motion to strike (and the demurrer) came on for hearing on April 10, 2013. The court heard argument on the anti-SLAPP motion, following which it essentially held that Soldis's letter was not the basis of the Bank's declaratory relief action, concluding as follows: "This is a long, ongoing dispute back and forth between the parties. It seems to me that the Bank has appropriately stated a basis for seeking declaratory relief and that they are not guilty of [the] type of conduct that the special motions to strike were—those statutes were created to protect from. He sent the letter. And it's true—so his letter was a protected activity. But it wasn't the sending of the letter or to keep him from doing it, the letter is simply offered as evidence of the fact that they have an unresolved dispute. That is how the court sees it at this point. So the court will overrule the special motion to strike and the demurrer as well."

On May 13, 2013, the trial court entered its formal order, the substance of which concluded as follows: "While Soldis' July 5, 2012 letter was protected activity, the Court does not find that Soldis has shown that the protected activity was the primary thrust or gravamen of USAA's Complaint. The Court is not persuaded by Soldis' argument that USAA's Declaratory Relief Complaint was filed in order to chill Soldis' free speech rights or right of petition. Rather, the Court agrees with USAA that USAA seeks to

8

resolve a long-standing dispute between the parties concerning a debt. IT IS THEREFORE ORDERED that Defendants Special Motion to Strike and Request for Attorney's Fees is DENIED."

On May 20, Soldis filed his appeal.

## DISCUSSION

### The Anti-SLAPP Law

We recently discussed the SLAPP law and its operation, in *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463–464:

"Subdivision (b)(1) of section 425.16 provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP, including, as pertinent here, '(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his

9

or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988.)"

**The Bank's Complaint Does Not Arise From Protected Activity**

As indicated above, the trial court concluded that Soldis failed to meet his burden under the first step of the SLAPP analysis, failing to demonstrate that the Bank's complaint arose from protected activity. Soldis contends this was error, that the actual controversy of the Bank's action is based on his demand letter, a demand letter that was in anticipation of litigation and thus protected activity. In claimed support of this argument, Soldis asserts that "[b]ut for Soldis' July 5 letter, there would be no actual controversy" and "[b]ut for Soldis' pre-litigation activities, [the Bank] could not state a cause of action for declaratory relief . . . ." Soldis makes much of the fact that the Bank's lawsuit was filed shortly after the Bank received his letter. As he puts it at one point: "Soldis' demand letter gave notice that he would be bringing a lawsuit unless he and USAA [FSB] could resolve certain issues. Soldis' letter was a demand letter and contained a draft lawsuit for breach of contract against USAA [FSB]. Soldis claimed, in that letter, that he did not owe any money to USAA and that the alleged debt claimed by USAA was resolved finally and completely following litigation and settlement in 2003."

It is, of course, the law that statements made in the course of judicial proceedings are protected by the anti-SLAPP statute. (*Navellier, supra,* 29 Cal.4th at p. 90.) This includes prelawsuit notices and demands. (See, for example, *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 944–945 [sexual harassment plaintiff's prelitigation complaints to employer's human resources manager, made to address potential affirmative defense that

10

plaintiff failed to take advantage of employer's internal remedial procedures, were protected as statements prior to litigation]; *CKE Restaurants, Inc. v. Moore* (2008) 159 Cal.App.4th 262, 271 [statements made in Proposition 65 intent-to-sue notice within protection of SLAPP statute]; *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887 [analyzing attorney demand letter in context of litigation privilege]; *Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 35–36 [same].) Thus, Soldis is correct that his demand letter could be protected activity.

The issue is whether the Bank's declaratory relief lawsuit arises from such protected activity. We conclude it does not.

To begin with, the fact that the Bank's lawsuit was filed after Soldis's letter does not establish that the lawsuit "arose from" that activity. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 77 (*City of Cotati*); *Navellier, supra,* 29 Cal.4th at p. 88; see *Personal Court Reporters, Inc. v. Rand* (2012) 205 Cal.App.4th 182, 189 [collecting cases].) As the Supreme Court explained in *City of Cotati, supra,* at pp. 76-77: "It is indisputably true, as the trial court observed, that City's action was filed shortly after Owners filed their claim in federal court. But the mere fact an action was filed after protected activity took place does not mean it arose from that activity. The anti-SLAPP statute cannot be read to mean that 'any claim asserted in an action which arguably was filed in retaliation for the exercise of speech or petition rights falls under section 425.16, whether or not the claim is *based on* conduct in exercise of those rights.' (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1002; see also *Briggs* [*v. Eden Council for Hope and Opportunity* (1999) 1106] at p. 1114 ['arise from' means 'based upon'].)"

In short, it is not enough to show that the action *was* "triggered by"—or filed in response to or in retaliation for—a party's exercise of free speech rights. A cause of action may be "triggered by" protected activity without necessarily "arising from" that activity." (*City of Cotati, supra,* 29 Cal.4th at pp. 77-78; *Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.)

11

As we recently explained in *Moriarty v. Laramar* (2014) 224 Cal.App.4th 125, cd133: "In order for a complaint to be within the anti-SLAPP statute, the 'critical consideration . . . is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' (*Navellier v. Sletten*[*, supra,*] 29 Cal.4th [at p.] 89.) To make that determination, we look to the 'principal thrust or gravamen of the plaintiff's cause of action.' (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188; *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1279.)"

The thrust, the gravamen, of the Bank's lawsuit is the long-simmering dispute between the parties. While Soldis's demand letter may be one piece of evidence relevant to the Bank's declaratory relief action, it is just that, as accurately described by the trial court: the letter is "simply . . . evidence of the fact that [the parties] have an unresolved dispute." Soldis's letter is, at most, incidental to the thrust of the Bank's action—and not within the SLAPP statute. (See generally *Gotterba v. Travolta* (2014) 228 Cal.App.4th 35 [denial of anti-SLAPP motion, concluding that Gotterba's complaint was not "based upon . . . sabre-rattling demand letters"].)

*Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154 is instructive. There, a landlord served tenants a notice under the Ellis Act (Gov. Code, § 7060 et seq.) that the landlord intended to withdraw rental units, including that occupied by the tenants, from the market. Following receipt of the notice, the tenants there, like the Bank here, filed a declaratory relief action seeking declaration of their rights under the Ellis Act. The landlords filed a SLAPP motion, which the trial court granted. The Court of Appeal reversed, in language strikingly applicable here: "Defendants have fallen victim to the logical fallacy *post hoc ergo propter hoc*—because the notices preceded plaintiffs' complaint the notices must have caused plaintiffs' complaint. The filing and service of the notices may have triggered plaintiffs' complaint and the notices may be evidence in support of plaintiffs' complaint, but they were not the cause of plaintiffs' complaint. Clearly, the cause of plaintiffs' complaint was defendants' allegedly wrongful reliance on the Ellis Act as their authority for terminating plaintiffs' tenancy. (*Marlin v. Aimco Venezia, LLC, supra,* 154 Cal.App.4th at p. 160.)

*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301 is similar. There, again like the Bank here, plaintiff filed an action for declaratory relief to obtain a determination that defendant's conduct (involvement in protests) was a breach of a settlement agreement. The trial court denied the SLAPP motion. The Court of Appeal affirmed, holding that, despite that the conduct in question—exercise of constitutional right of free speech— was protected activity, the City's action did not arise from that exercise, but rather from a controversy between the parties as to the scope of the settlement agreement—in essence, a contract dispute. (*Id.* at p. 1308.)

In *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, a seller of real property brought an action against the buyer, the city, and city officials for breach of contract, fraud, and related causes of action, in which some of the actions complained of related to defendants' conduct in obtaining and issuing permits. The trial court granted the anti-SLAPP motion. The Court of Appeal reversed, holding that the thrust of the action did not "arise from" these activities. (*Id.* at pp. 808-809.) Likewise here.

The Bank's complaint describes the principal thrust, the gravamen, of its action here. And it is far broader than arising from Soldis's demand letter. As quoted above, it is as follows: "A dispute and an actual controversy has arisen and now exists between USAA FSB and Soldis as to the respective rights, duties and obligations of the parties under and by virtue of the terms, limitations, conditions, and provisions of the Depository Agreement, in that USAA FSB contends that it is entitled to a setoff due to overdrawn funds, while Soldis disagrees with this assessment." That complaint is not within the anti-SLAPP statute. Soldis's motion was properly denied.

One last point. Soldis contends that one isolated comment by the trial court in the order denying his SLAPP motion is a basis for reversal. That comment was this: "The Court is not persuaded by Soldis' argument that USAA [FSB's] Declaratory Relief Complaint was filed in order to chill Soldis' free speech rights or right of petition." Pointing to this language, Soldis contends that "[t]he Order denying Soldis' anti-SLAPP

13

motion is expressly predicated on a finding that the Complaint was not filed with the intent to chill Soldis' " constitutional rights.

While Soldis's assertion may not be an accurate description of the record, Soldis is correct that the trial court's comment was misguided, as a defendant in a SLAPP motion need not show that the lawsuit was brought with the subjective intent to "chill." (*Equillon Enterprises, LLC v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 58.) Regardless, the statement can have no bearing here, where our review is de novo.

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.[*]

_____

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14