[No. C039243. Third Dist. May 30, 2003.]

KEVIN BEACH, Plaintiff and Respondent, v.
HARCO NATIONAL INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Murphy, Pearson, Bradley & Feeney, Mark E. Ellis and Jacob Koper for Defendant and Appellant.

Dreyer, Babich, Buccola & Callaham and Eliot M. Reiner for Plaintiff and Respondent.

## OPINION

**HULL, J.**—When plaintiff Kevin Beach filed a complaint alleging breach of the covenant of good faith and fair dealing, defendant Harco National Insurance Company (Harco) responded by filing a *motion to strike under the* "anti-SLAPP" (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16. (Further undesignated statutory references are to the Code of Civil Procedure.) The trial court denied the motion, and defendant appeals. (§ 425.16, subd. (j).) We affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

The nature of this appeal requires a detailed chronology of events.

Plaintiff was a truck driver. On the night of February 1, 1996, he pulled over his rig to the side of the road to help another truck driver who was having problems. Plaintiff's daughter, who was riding as a passenger with her father, got out of the truck and stood by the side of the road. She was struck by a car driven by Jason Abbott, an uninsured motorist, and was seriously injured. The traffic collision report ascribed fault to Abbott but also noted that plaintiff, by leaving his headlights on high-beam and pointing them into oncoming traffic, contributed to the accident.

Plaintiff was insured with Harco. His policy included $30,000 in uninsured motorist coverage for "bodily injury."

On January 31, 1997, plaintiff filed suit against Abbott, asserting he suffered serious emotional distress when he witnessed the accident.

In July 1997, plaintiff's daughter filed suit against her father, Abbott, and others. Her complaint alleged, in part, that her father was negligent or reckless in parking his vehicle in an unsafe manner and in allowing his daughter to be in a position of danger.

On January 13, 1998, plaintiff's then lawyer, Grant Pegg, wrote to Harco, demanding the $30,000 limits of his uninsured motorist policy. Pegg noted

that Harco should be familiar with the accident because defendant was "handling ... the lawsuit that has been filed by [plaintiff's] daughter, Tara Beach, that arose from said accident." He stated that plaintiff "was standing only a few feet [from] Tara when she was struck by the Abbott vehicle. As a result of the trauma of witnessing his daughter being struck by a vehicle and from witnessing the horrific injuries to his daughter, [plaintiff] has suffered from great emotional distress since the date of the accident." Pegg concluded: "In short, I believe this is the perfect example of a *Dillon vs. Legg* type of claim and I am hopeful that we can resolve this matter without too much effort. I believe that our demand is completely reasonable in light of the proximity of [plaintiff] to his daughter at the time of impact, and the nature of the injuries sustained by his daughter."

According to a declaration later filed by Pegg, plaintiff made a formal demand for arbitration in May 1998, although as late as August 1999, Harco stated it was unaware of any such demand. At some point, however, the parties selected Joe Ramsey "to act as an arbitrator and/or even as a mediator (ahead of time in advance of the arbitration), if we so choose to mediate."

On November 6, 1998, Harco's attorney sent Pegg a letter, stating, in part: "When we last spoke some time back, you were planning to provide me copies of the materials to document your client's uninsured motorist claim, including his treatment records. I still have not seen those materials." He continued: "Also, in light of the nature of the accident, I am somewhat confused about the scope of your client's claim. Therefore, I would ask you to clarify the following in writing, to help set the parameters of the uninsured motorist claim." Harco asked: "Is it true that [plaintiff] is not claiming that he suffered any actual physical injuries, but rather, his uninsured motorist claim is solely for a *Dillon v. Legg* bystander emotional distress claim?" Harco also sought to verify that plaintiff's employer and the driver of the other truck both had "valid and collectible auto coverage, each with policy limits of $1 million." This letter concluded: "Assuming that the answers to both of these questions is 'yes,' and assuming further that you provide me with the documents referred to above, it would appear that, as far as we are concerned, we could proceed with the arbitration and without depositions or discovery."

Pegg replied 10 days later, on November 16, 1998, confirming that "[plaintiff] is making a *Dillon vs. Legg* claim arising from the subject accident and that the uninsured motorist is Jason Abbott." Pegg also confirmed that the other truck driver and plaintiff's employer carried $1 million in insurance policies. Pegg stated: "I agree that little discovery needs to be done prior to the arbitration. Other than the records from [plaintiff's] treating physician, please let us know if you want any other documents to prepare for the arbitration."

At some point the same month, November 1998, plaintiff replaced Pegg with a new lawyer, Glenn Guenard. According to his declaration, Guenard telephoned and wrote to Harco's attorney on November 30, 1998, to find out why policy limits had not been paid.

In December 1998, plaintiff filed a demand for the production of documents, to which Harco responded in January 1999.

Guenard wrote letters to the attorneys representing Harco in February 1999, March 1999 and June 1999 but received no reply. In a letter dated June 4, 1999, Guenard wrote that he would contact the previously selected arbitrator, Joe Ramsey "to obtain an arbitration date to resolve this case. I'll select dates within 30-60 days from today."

Guenard sent a follow-up letter to Harco on July 12, 1999, which resulted in further communication between the parties. Harco wrote Guenard on August 10, 1999, "to confirm our telephone conversations over the last week." The letter stated that "Harco's tentative position in this case remains that there is no uninsured motorist coverage available to [plaintiff] here. This position was previously communicated to Grant Pegg, [plaintiff's] attorney before you." Harco explained that this was based on Pegg's confirmation that plaintiff had not suffered any physical injuries. Harco stated that coverage was available under the policy only for bodily injury or property damage, and that emotional distress without physical injury or manifestation was not bodily injury and therefore not a covered occurrence.

This letter continued: "However, Harco has made no final determination on this issue, as we have been awaiting the receipt of the medical and psychological information requested from [plaintiff] in our November 6, 1998 correspondence .... To date, we have not received that information. Once Harco has received and evaluated that information, it will be in a position to formally decide its coverage obligation to [plaintiff] based upon this issue. In this regard, the policy requires that [plaintiff] cooperate with Harco with respect to its investigation, as well as to his medical records."

Harco also expressed its doubt that "this case even constitutes an uninsured motorist matter given that there were other ostensibly responsible tortfeasors ... such as [the other truck driver and plaintiff's employer], who had applicable insurance coverage with higher limits than [plaintiff]."

Harco stated it was unaware of any formal demand by plaintiff for arbitration, but it reiterated its willingness to participate in arbitration. In response to plaintiff's apparent suggestion of bad faith, it opined that any delay in responding to plaintiff's claim was "attributable to [plaintiff] in, *inter*

*alia,* not formally demanding arbitration and then setting the arbitration, as well as, furthermore, in not supplying the medical and psychological information and records requested by Harco in 1998."

Finally, Harco confirmed that the parties had earlier agreed to present two issues to Joe Ramsey "for a rendition of advisory rulings," and that this hearing, scheduled for September 7, 1999, was to determine "(1) whether there is coverage for your client's claim under the policy, and (2) if there is coverage, the amount to which your client is entitled up to the $30,000 uninsured motorist policy limits. The decision of Mr. Ramsey will be advisory only, and either side may reject his decision and proceed with the binding uninsured motorist mediation."

Harco enclosed a copy of plaintiff's insurance policy, which plaintiff had requested previously.

On August 18, 1999, Attorney Guenard responded. He stated that Harco's letter was the first communication he had received since undertaking plaintiff's representation, despite numerous letters sent earlier. He wrote: "[T]his is the first time anyone from your office has stated that it is Harco's tentative position that there is no uninsured motorist coverage available to [plaintiff]. [Harco's] letter of November 6, 1998, to Mr. Pegg, which you enclosed in your letter to me, was the first time that I saw that letter. It was not provided to me in the materials that [plaintiff] obtained from his prior attorney, Mr. Pegg. [¶] You are correct that the uninsured motorist claim of [plaintiff] is based on a *Dillon v. Legg* claim. However, you are incorrect that it is only for emotional distress. [Plaintiff] has been diagnosed with post-traumatic stress disorder with physical manifestations arising out of the occurrence."

Guenard continued: "[N]o request for medical records or information regarding [plaintiff] was ever made to me, and as stated previously, I had never seen that request contained in [Harco's] letter of November 6, 1998. We will provide this information now that you have requested it. [Plaintiff] has always been willing to cooperate with Harco with regard to investigation of this claim."

Guenard expressed surprise at Harco's suggestion that the fact others were insured might indicate plaintiff did not have a valid uninsured motorist claim. Guenard noted Harco had not responded to form interrogatories that had been propounded in March, and asked that Harco provide all facts and documents in support of their contention.

Guenard added: "[I]f a formal demand for arbitration has not been previously made, I am now making a formal demand for arbitration."

In discussing a possible claim for bad faith, he added: "Your opinion that any claimed delay in responding to [plaintiff's] claim is attributable to him not formally demanding arbitration and then setting the arbitration, as well as not supplying medical and psychological information in records requested by Harco in 1998, is totally incorrect. [Plaintiff] made an uninsured motorist claim, and Harco has the duty to investigate that claim and pursue the resolution of that claim with reasonable diligence. In fact, Harco was supposed to find a·way to pay uninsured motorist benefits to [plaintiff]. The fact that whether or not [plaintiff] ever demanded arbitration does not abrogate Harco's duty to investigate and resolve [plaintiff's] claim with reasonable diligence. As far as supplying medical and psychological information and records that were requested by Harco, I was never aware of that request, as stated previously, and [plaintiff] was not aware of this request either. However, again, once I notified your office of my representation of [plaintiff], your office never requested that information from me. I would have gladly provided it if requested."

Guenard agreed to the proceeding before Joe Ramsey but stated, "I would characterize this proceeding as a mediation, because it is advisory only and either side may wish to pursue to a binding uninsured motorist arbitration pursuant to the insurance code."

He concluded: "[Plaintiff] is, and always has been, willing to cooperate in the investi[g]ation of his claim. I have requested his medical records associated with treatment arising out of this occurrence. If you need any other documents, please let me know."

These medical records were not submitted to Harco. Instead, appended to the mediation brief prepared by plaintiff was an unsworn letter from Robert Johnson, M.D., dated August 31, 1999. This letter stated plaintiff was suffering from posttraumatic stress disorder and had a poor prognosis. Dr. Johnson outlined plaintiff's symptoms and the psychotherapy sessions he had conducted. He stated that physical manifestations of plaintiff's psychological distress "included tremor, tachycardia, and double vision." He believed that psychotherapy and medication management would continue for the next two to four years.

The hearing before the mediator occurred as scheduled, and on September 27, 1999, the mediator issued his opinion, finding coverage under the policy and plaintiff's damages equal to, or greater than, the $30,000 policy limits.

Correspondence between Harco and plaintiff ensued over the next few months. On November 23, 1999, plaintiff filed a petition to compel arbitration. On December 28, 1999, Harco wrote plaintiff to confirm that the parties

had agreed to settle the case for $30,000. Plaintiff executed a release on February 8, 2000, and the case settled.

On January 24, 2001, plaintiff filed a complaint against Harco for breach of the covenant of good faith and fair dealing. He asserted that Harco (1) failed to provide a copy of the insurance policy when requested; (2) failed to accept or deny his claim within 40 days; (3) offered no explanation for that failure; (4) failed to respond to discovery requests; (5) failed to respond to a request for arbitration; (6) failed to participate in an arbitration proceeding to resolve the claim, (7) failed to communicate with plaintiff; (8) failed to make payment under the policy "when it was clear that said obligation was owing"; and (9) failed to evaluate plaintiff's claim in a systematic, fair and reasonably prompt manner.

Harco filed a motion to strike the complaint under section 425.16, the anti-SLAPP suit statute. It asserted that the statute was applicable to this type of complaint, and that plaintiff could not demonstrate the probability of prevailing on his action. It argued plaintiff's claim lacked merit, and was also barred by the litigation privilege, Civil Code section 47, subdivision (b). Plaintiff opposed the motion, arguing that section 425.16 was inapplicable, because his lawsuit for breach of the covenant of good faith and fair dealing was not brought with the intent to chill defendant's First Amendment rights. He asserted that the anti-SLAPP provision should not be "so broadly interpreted so as to abrogate the law of contracts ...," and he argued he would in fact prevail on the merits of his case.

The trial court denied the motion to strike, finding this case "[did] not fit the profile of a SLAPP suit." The court ruled that arbitration in an uninsured motorist proceeding did not involve petitioning within the meaning of the anti-SLAPP statute, and it further held that permitting anti-SLAPP motions in this context would "completely emasculate" Insurance Code section 790.03, subdivision (h), which outlines unfair claims settlement practices. The court found that there was a probability plaintiff would prevail on his claim, and rejected Harco's assertion that its conduct was privileged under Civil Code section 47, subdivision (b).

Harco appeals. (§ 425.16, subd. (j).)

## DISCUSSION

Section 425.16 was designed to eliminate at an early stage of the proceedings nonmeritorious or retaliatory litigation "meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. [Citation.] These meritless suits, referred to under the

acronym SLAPP, or strategic lawsuit against public participation, are subject to a special motion to strike unless the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677]; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 806 [119 Cal.Rptr.2d 108].) Section 425.16 prevents abuses of the judicial system, and its anti-SLAPP protections are to be construed broadly. (§ 425.16, subd. (a).)

Subdivision (b)(1) of this statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

In making these determinations, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

In reviewing the denial of a motion to strike under section 425.16, we apply a two-part test. "First, we determine whether plaintiff's causes of action arose from acts by defendant[] in furtherance of defendant['s] rights of petition or free speech in connection with a public issue. [Citation.] Assuming this threshold condition is satisfied, we then determine whether plaintiff has established a reasonable probability that [he] will prevail on [his] claims at trial. We must reverse the order denying the motion if plaintiff failed to make a prima facie showing in the trial court of facts, which, if proved at trial, would support a judgment in [his] favor. [Citation.] Whether section 425.16 applies and whether the plaintiff has shown a probability of prevailing are legal questions which we review independently on appeal." (*Seelig v. Infinity Broadcasting Corp., supra,* 97 Cal.App.4th at pp. 806–807.)

With this framework in mind, we turn to the issues raised in this appeal.

As noted, section 425.16, subdivision (b)(1) provides that a motion to strike may be directed to "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue ...."

We address two preliminary issues before getting to the heart of this appeal.

■ First, plaintiff contends the court properly denied Harco's motion to dismiss because his suit alleging bad faith was not brought with the intent of

chilling defendant's rights of petition or free speech. However, as the California Supreme Court recently clarified, the statute does not require such an intent. *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*) held there was nothing in section 425.16 "implying or even suggesting an intent-to-chill proof requirement" (*Equilon,* at p. 59), and concluded that judicial imposition of such an prerequisite "would contravene the legislative intent expressly stated in section 425.16, as well as that implied by the statute's legislative history." (*Ibid.*) The court further noted that "[a] requirement that courts confronted with anti-SLAPP motions inquire into the plaintiff's subjective intent would commit scarce judicial resources to an inquiry inimical to the legislative purpose that unjustified SLAPP's be terminated at an early stage" (*id.* at p. 65), and it discounted Equilon's concern that such a conclusion would transform the anti-SLAPP statute into a weapon to chill the exercise of protected rights. (*Ibid.*) Emphasizing that "[t]he anti-SLAPP remedy is not available where a probability exists that the plaintiff will prevail on the merits" (*ibid.*), the court concluded: "[A]s section 425.16 already contains express limitations on the availability and impact of anti-SLAPP motions, courts confronting such motions are well equipped to deny, mitigate, or even sanction them when appropriate. [I]t is not necessary that we impose an additional intent-to-chill limitation in order to avoid jeopardizing meritorious lawsuits." (*Id.* at p. 66.)

■ Second, to the extent that plaintiff suggests bad faith claims should be exempt from anti-SLAPP motions, case law holds otherwise. There is simply no authority for creating a categorical exception for any particular type of claim, as the California Supreme Court recently affirmed: " 'Considering the purpose of the [anti-SLAPP] provision, expressly stated, the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights' [citation]. 'The Legislature recognized that "all kinds of claims could achieve the objective of a SLAPP suit—to interfere with and burden the defendant's exercise of his or her rights." ' " (*Equilon, supra,* 29 Cal.4th at p. 60.) "Nothing in the statute itself categorically excludes any particular type of action from its operation, and no court has the ' "power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Given these pronouncements, and the Legislature's express reminder that anti-SLAPP motions should be "construed broadly" (§ 425.16, subd. (a)), we do not find room to except claims involving bad faith from the reach of the statute.

Notwithstanding plaintiff's fears, exposing bad faith claims to possible anti-SLAPP motions does not signal the end of bad faith actions. A motion

under section 425.16 cannot be granted if "the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) It is therefore only *unmeritorious* actions that will suffer an early demise.

Having resolved these preliminary issues, we turn to the central issue of this appeal: Is Harco entitled to relief under the anti-SLAPP statute?

In determining whether plaintiff's complaint is subject to the provisions of section 425.16, we must "consider the pleadings, and the supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

Plaintiff's complaint alleged that defendant "failed to act in a fair, prompt, and equitable fashion relative to the investigation and claims handling decisions as presented by the facts of Plaintiff's loss. Specifically, defendant[] ... acted maliciously, which included, but is not limited to, the following conduct:

"1. Failing to provide [plaintiff] with a certified copy of his uninsured/underinsured motorist policy upon his repeated request.

"2. Failing to accept or deny the claim, either in whole or in part, within forty (40) calendar days of receiving proof of the claim.

"3. Failing to provide an explanation of why the claim has not been accepted or denied;

"4. Failing to respond to discovery requests sent by [plaintiff];

"5. Failing to respond to a request for arbitration;

"6. Failing to participate in any arbitration proceeding or other means to resolve the claim by [plaintiff];

"7. Failing to communicate with [plaintiff];

"8. Failing to make payment under the policy when it was clear that said obligation was owing;

"9. Failing to evaluate the claim in a systematic, fair and reasonably prompt fashion."

The anti-SLAPP statute provides that a motion to strike may be made in response to "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue …." (§ 425.16, subd. (b)(1).) And the statute defines "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" to include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Although Harco repeatedly refers to plaintiff's allegations as involving both conduct and communications, they do not. The bad faith behavior ascribed to defendant involves nonaction and delays. Plaintiff's complaint does not refer to any "written or oral statement or writing" that might invoke section 425.16, subdivision (e)(1)–(3). Only the "other conduct" clause found in section 425.16, subdivision (e)(4) provides a potential basis for an anti-SLAPP motion.

Plaintiff's claim for bad faith centers on defendant's conduct in handling its uninsured motorist claim, specifically, the delays that occurred between the time plaintiff first made a claim for uninsured motorist coverage in January 1998, and the time that he received his settlement check in March 2000. Despite Harco's claims to the contrary, none of this conduct can be deemed to be in furtherance of Harco's exercise of its constitutional right of petition.

■ The right to petition includes the act of filing litigation or seeking administrative action. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*); see also *Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1122–1123 [55 Cal.Rptr.2d 909], disapproved on other grounds in *Briggs, supra,* 19 Cal.4th at p. 1123, fn. 10 [right to petition also includes acts designed to influence public opinion about issues before legislative or administrative bodies]; Barker, *Common-Law and Statutory Solutions to the Problem of SLAPP* (1993) 26 Loyola L.A. L.Rev. 395, 425–429 [overview of right of petition].) This right is not one way. Just as a plaintiff invokes the right of petition by filing a lawsuit or seeking administrative action, a defendant, when

responding to such an action, exercises the same constitutional right. (See *Logan v. Zimmerman Brush Co.* (1982) 455 U.S. 422, 429 [71 L.Ed.2d 265, 273, 102 S.Ct. 1148]; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 647–648 [49 Cal.Rptr.2d 620], disapproved on other grounds in *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5; *Wolfgram v. Wells Fargo Bank* (1997) 53 Cal.App.4th 43, 52–53 [61 Cal.Rptr.2d 694].) Here, however, the acts plaintiff complains of do not relate to the exercise of any such rights by Harco.

In *City of Cotati v. Cashman* (2002) 29 Cal.4th 69 [124 Cal.Rptr.2d 519, 52 P.3d 695] *(Cotati),* the California Supreme Court explained: "[T]he statutory phrase 'cause of action … arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) ….' " *(Id.* at p. 78.)

"In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " *(Cotati, supra,* 29 Cal.4th at p. 79.)

■ Here, plaintiff asserts that conduct by Harco amounted to bad faith in the handling of plaintiff's claim for uninsured motorist coverage. The conduct centers on the delay in responding to and resolving plaintiff's claim. None of this conduct involved Harco's right to petition. While communications preparatory to bringing (or responding to) an action or arbitration might, under the proper circumstances, be deemed to fall within the scope of section 425.16 (see *Briggs, supra,* 19 Cal.4th at p. 1115; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 [54 Cal.Rptr.2d 830]), the conduct complained of here does not cross this threshold. The outlined actions (or nonactions) occurred as part of a coverage dispute between an insurer and its insured, and occurred long before any arbitration or other proceeding commenced. (See *State Farm General Ins. Co. v. Majorino* (2002) 99 Cal.App.4th 974, 977 [121 Cal.Rptr.2d 719].) Nothing had yet happened to which a right to petition attached. While we have no quarrel with Harco's claim that an insurer is entitled to defend itself against unmeritorious claims, the fact that a dispute exists that might ultimately lead to arbitration does not make every step in that dispute part of a right to petition. Just as plaintiff could not claim that his petitioning rights were invoked the moment he submitted a claim to Harco (see *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 932 [116 Cal.Rptr.2d 187]),

Harco cannot claim that the submission of plaintiff's claim immediately gave rise to Harco's own petitioning activities.

In determining that Harco was not entitled to relief under section 425.16, we do not express any opinion as to the merits of plaintiff's complaint. We hold only that the anti-SLAPP statute does not apply to this dispute.

## DISPOSITION

The order of the trial court is affirmed. Plaintiff is awarded his costs on appeal.

Blease, Acting P. J., and Morrison, J., concurred.

A petition for a rehearing was denied July 29, 2003, and on June 30, 2003, and July 29, 2003, the opinion was modified to read as printed above.