Filed 10/27/14  Tamman v. Nixon Peabody LLP CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID TAMMAN,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NIXON PEABODY LLP,<br><br>    Defendant and Appellant. | B252332<br><br>(Los Angeles County<br>Super. Ct. No. BC471675)<br><br>**ORDER MODIFYING OPINION**<br><br>**[No Change in Judgment]** |

THE COURT:[*]

It is ordered that the opinion filed herein on September 30, 2014, be modified as follows:

Page 1:  Correct the spelling of the surname of counsel for Plaintiff and Respondent to Wohl.

This modification does not effect a change in judgment.

_____

[*]    ASHMANN-GERST, Acting P.J.,    CHAVEZ, J.    FERNS, J.,[†]

[†]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 9/30/14  Tamman v. Nixon Peabody LLP CA2/2 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID TAMMAN, | B252332 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC471675) |
| NIXON PEABODY LLP, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Maureen Duffy-Lewis, Judge.  Affirmed.

Hill, Farrer & Burrill, Kevin H. Brogan, Dean E. Dennis, William A. Meyers for Defendant and Appellant.

Law Offices of James P. Whol, James P. Whol for Plaintiff and Respondent.

_____

Plaintiff and respondent David Tamman alleged causes of action for breach of contract, breach of fiduciary duty, intentional interference with economic relationship and declaratory relief against defendant and appellant Nixon Peabody LLP.  Appellant appeals from the trial court's order denying its special motion to strike brought pursuant to Code of Civil Procedure section 425.16.[1]  We affirm.  Appellant failed to meet its burden to show that Tamman's claims arose from protected activity within the meaning of section 425.16.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Facts Leading to Tamman's Complaint.*

In February 2007, Tamman joined appellant as a partner and executed a counterpart of appellant's written partnership agreement, captioned Amended and Restated Articles of Partnership (February 1, 2004) (Partnership Agreement), which set forth the terms and conditions of his partnership.  Section 1.15 of the Partnership Agreement provided in part:  "The Firm shall indemnify, defend and hold harmless the Partners and the Principals and former Partners and Principals (each, an 'Indemnitee'), from and against all liabilities, obligations, claims, damages, penalties, fines, causes of action, judgments, costs and expenses (including reasonable experts' and consultants' fees and expenses and reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against the Indemnitee or otherwise arising out of, (i) the practice of law by such Indemnitee on Firm matters and/or the practice of law by other Firm personnel, including, without limitation, professional malpractice and/or breach of contract to provide legal services, (ii) the Indemnitee's status as a Partner or a Principal, (iii) without limiting the generality of clause (ii) above, contractual obligations of the Firm, including, without limitation, with respect to a Partner or Principal acting as a guarantor or surety of any obligation of the Firm, or (iv) acts or omissions of the Indemnitee on behalf of the Firm or otherwise in pursuit of the Firm's business. . . .  In no event, however, shall the

---

[1]     Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Firm have any obligation to indemnify, defend or hold harmless an Indemnitee with respect to any matter arising out of the Indemnitee's fraud, breach of fiduciary duty arising out of self dealing or misapplication or misappropriation of money or property or other similar breach, or willful misconduct."

The clients—alleged as his "Book of Business"—Tamman brought with him when he joined the partnership had economic value to appellant. According to Tamman, from 2007 to 2009, his Book of Business generated between $1.5 million and $1.95 million annually in billings for appellant, and yielded between $325,000 and $410,000 annually in income to Tamman. NewPoint Financial Services, Inc. (NewPoint) was among the clients Tamman brought with him, and Tamman, on appellant's behalf, entered into a retainer agreement with NewPoint in March 2007. NewPoint's contact with Tamman was exclusively through John Farahi (Farahi), NewPoint's co-owner, president, secretary and treasurer.

While at his prior firm, Tamman had reviewed NewPoint's private placement memorandum (PPM) in May 2003. In or about September 2008, Farahi told Tamman that NewPoint sought to raise $30 million by way of a private debenture offering and that he wanted appellant to draft a new PPM. Tamman, together with associate Matthew Grazier, prepared a draft PPM and transmitted it to Farahi within the next 30 days. Thereafter, in November 2008, Tamman learned that NewPoint had suffered losses between $7 and $11 million during the last half of 2008 and also learned that NewPoint intended to pay off all or part of the 2003 debenture indebtedness with the proceeds described in the PPM. After discussing the matter with two of appellant's securities partners, Tamman directed Grazier to prepare a new draft PPM that included disclosures related to the losses and the 2003 debenture payoff. Tamman reviewed the draft and forwarded it to NewPoint.

During a March 2009 conference call among Tamman, Grazier, Farahi and corporate law partner William Kelly, Farahi revealed that the losses now disclosed in the draft PPM had occurred in his personal brokerage account, not NewPoint's corporate account. Kelly advised that the losses should be characterized as a loan from NewPoint

3

to Farahi. Kelly further proposed that the PPM relating to the 2003 debenture be updated with the same loan disclosures and with information about the investors' right to rescind. Finally, Kelly proposed adding to the PPM disclosures concerning the 2003 debenture and Farahi's past and future loans, and Tamman directed Grazier to draft the disclosures. A new draft PPM was forwarded to NewPoint in late March 2009.

On April 13, 2009, Farahi called Tamman and told him that Securities and Exchange Commission (SEC) staff had come to his office for a routine audit of his broker-dealer, NewPoint Securities, LLC. Farahi also requested that Tamman meet with him later that day and in a face-to-face meeting revealed that since October 2008 he had been using the initial draft PPM to sell NewPoint's offering. Tamman then sent Farahi a new draft PPM containing the additional disclosures, but dated it October 1, 2008. Tamman claimed Kelly had no comment concerning the date.

In May 2009, Tamman learned the SEC would be informally requesting documents from appellant, including versions of the PPM and NewPoint's investor list. Tamman also received a request for electronically maintained documents from Farahi's outside attorney retained to respond to SEC requests. After receiving advice from partner Edward O'Callaghan, Tamman provided the requested documents to Farahi's outside attorney but redacted them to remove metadata that could contain privileged material. Tamman provided unredacted files after Farahi signed a release.

In August 2009, the SEC subpoenaed appellant for documents and Tamman for documents and testimony relating to NewPoint's PPM. Appellant retained outside counsel to assist it in responding to the subpoena. Subsequently, appellant's outside counsel interviewed Tamman and advised him to retain separate counsel. Appellant and its outside counsel refused to respond to Tamman's repeated requests for the provision of a defense and indemnity under the Partnership Agreement.

In October 2009, the SEC issued another subpoena to appellant seeking documents related to the NewPoint investigation. Appellant unsuccessfully attempted to determine whether Tamman had any documents that were responsive to the subpoena. According to Tamman, appellant sought to distance itself from him to avoid liability. Tamman

4

submitted his resignation in October 2009, but appellant declined to accept it and instead terminated him. After appellant advised Tamman's clients of the termination, Tamman lost approximately 75 percent of his Book of Business.

In January 2011, the SEC initiated administrative proceedings against Tamman as a result of his representation of NewPoint, and specifically regarding his preparation of several versions of the PPM. Following June 2011 Grand Jury proceedings, the United States Attorney's Office filed a 41-count federal criminal indictment (Indictment) against Farahi and Tamman. The Indictment alleged that Farahi had engaged in a scheme to defraud investors and banks, and that Tamman conspired with him to obstruct and impede an official investigation and to knowingly alter or falsify documents with the intent to obstruct and impede an official investigation. More specifically, the Indictment alleged that Tamman backdated and made additional alterations to the PPM and the earlier 2003 PPM after Farahi informed him of the SEC investigation.

Following a November 2012 bench trial, the trial court found Tamman guilty on 10 counts, including conspiracy to obstruct justice; destruction, alteration, falsification of records; accessory after the fact; and obstruction of justice. He was later sentenced to 84 months in prison.

### *The Complaint and Special Motion to Strike.*

In October 2011, before the Indictment was filed, Tamman filed a complaint against appellant, alleging causes of action for breach of contract, breach of fiduciary duty, intentional interference with business relations and declaratory relief. He alleged that appellant breached the Partnership Agreement by failing and refusing to perform in good faith the promise to defend and indemnify contained in Section 1.15. He further alleged appellant breached the Partnership Agreement by retaining 75 percent of his Book of Business. He alleged the same breaches in support of his other causes of action. He sought general, special and punitive damages; a declaration with respect to his rights under the Partnership Agreement; and disgorgement of monies earned by appellant from his Book of Business.

5

Appellant filed a special motion to strike pursuant to section 425.16. Appellant argued that Tamman's claims arose from constitutionally protected petitioning activity, as its decision to neither defend nor indemnify Tamman occurred in the context of its response to an SEC investigation. The trial court granted Tamman's motion to stay the proceedings pending the disposition of the criminal action. After the stay was lifted, Tamman opposed the motion to strike, asserting that his claims did not arise from the exercise of constitutionally protected petitioning activity. Tamman further elected to exercise his rights under the Fifth Amendment and declined to provide a declaration designed to show he had a probability of prevailing on his claims.

At a September 9, 2013 hearing, the trial court denied the motion. Its order provided: "Claims based on client stealing are subject to anti-SLAPP. [Citation.] [¶] Decisions to decline indemnification are often based upon pending litigation. But, the argument that declining indemnification subjects the matter to anti-SLAPP is insufficiently pled and not supported by case law. The court declines to expand anti-SLAPP. Since defendant Nixon Peabody only moves on the 'indemnification' issues and fails to provide sufficient legal support, the special motion to strike is DENIED on the moving papers."

This appeal followed.

## DISCUSSION

A special motion to strike under section 425.16 permits a defendant to obtain an early dismissal of an action that qualifies as a "SLAPP," or "'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.) An order denying a special motion to strike is appealable. (§ 425.16, subd. (j)(1).) We independently review whether appellant's motion to strike was properly denied. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325-326; *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 270.)

## I. The Anti-SLAPP Law.

The anti-SLAPP statute authorizes a special motion to strike any cause of action arising from the exercise of petition or free speech rights: "A cause of action against a

6

person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (§ 425.16, subd. (a); accord, *City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1305.)

"'[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.)

To meet its initial burden, appellant had to show the act or acts that formed the basis for Tamman's claims fell within one of the four categories of conduct described in section 425.16, subdivision (e). That provision defines the phrase "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" to include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of

7

the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Here, given Tamman's failure to offer evidence in support of the second step—showing a probability of prevailing—we are concerned only with the first step. "In assessing whether a cause of action arises from protected activity, '"we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action . . .".' . . . We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]" [Citation.]' [Citation.] '[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech.' [Citation.] [¶] When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, 'courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. "[C]auses of action do not arise from motives; they arise from acts." [Citation.]' [Citation.] '"The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable." [Citation.]' [Citation.]" (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1520.)

## II.  Appellant Failed to Show Tamman's Claims Arose from Protected Activity.

In its motion to strike, appellant argued that Tamman's claims arose from protected activity because they were based on its "response" to the SEC investigation and subpoena, and the corresponding "decision" not to provide Tamman with a defense and indemnity.[2] It did not specify the subdivision of section 425.16 on which it was relying

---

[2]     As below, appellant focuses on its conduct in failing to defend or indemnify; it does not maintain that Tamman's allegations relating to client stealing arose from

8

to strike the complaint and instead relied on case law broadly construing section 425.16 to apply to conduct "'"arising from defendant's litigation activity."'" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)  The trial court ruled that appellant failed to meet its burden to show that its refusing indemnification was conduct subject to the anti-SLAPP statute.  We find no basis to disturb this conclusion.

Without question, "courts have adopted 'a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16.'  [Citation.]" (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537.) Indeed, "[t]he anti-SLAPP protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with or in preparation of litigation." (*Ibid.*)  That does not mean, however, that every cause of action brought against an entity that has some relationship to another legal action involving that entity can be considered a SLAPP subject to a special motion to strike.  (E.g., *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76-77 ["the mere fact that an action was filed after protected activity took place does not mean it arose from that activity"]; *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 729 ["the fact plaintiffs' claims are related to or associated with [the defendant's] litigation activities is not enough"]; *Kolar v. Donahue, McIntosh & Hammerton*, *supra*, at p. 1537 ["it does not follow that any claims associated with [litigation-related] activities are subject to the anti-SLAPP statute"].)

Rather, as explained earlier, the moving defendant must show protected petitioning activity is the gravamen or principal thrust of the plaintiff's claims.  (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at pp. 77-78.)  Thus, the inclusion of allegations

protected activity.  Indeed, given the absence of allegations that appellant engaged in any "conduct" designed to acquire Tamman's Book of Business, we agree with appellant that such allegations were not covered by the anti-SLAPP statute.  (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 ["[t]he anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability"].)

involving protected activity does not subject a claim to the anti-SLAPP statute where the protected activity merely preceded or triggered the lawsuit. (*Id.* at p. 78; *Clark v. Mazgani* (2009) 170 Cal.App.4th 1281, 1289; *Kolar v. Donahue, McIntosh & Hammerton*, *supra*, 145 Cal.App.4th at p. 1537; *State Farm General Ins. Co. v. Majorino* (2002) 99 Cal.App.4th 974, 977.) Stated another way, "[i]f the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]" (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.) "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cahsman*, *supra*, at p. 78.)

Here, the principal thrust or gravamen of Tamman's claims did not arise from protected activity. In connection with his breach of contract cause of action, Tamman described the facts surrounding his New Point representation and leading to the SEC investigation. He further alleged that the SEC involvement triggered his request for a defense and indemnification according to the terms of the Partnership Agreement. His first cause of action did not arise from the SEC investigation; it arose from appellant's failure to provide a defense or indemnity under the Partnership Agreement. (See *City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78 ["That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such"].) He alleged appellant "breached the Partnership Agreement with Plaintiff by failing and refusing to perform in good faith [its] promise to defend Plaintiff as contained in Section 1.15 of the Partnership Agreement"; appellant "breached the Partnership Agreement with Plaintiff by failing and refusing to perform in good faith [its] promise to indemnify Plaintiff as contained in the Indemnity Provision"; and appellant failed and refused to respond to his timely demands for defense and indemnification. He further alleged that appellant's conduct resulted in its retaining or destroying 75 percent of his Book of Business. According to Tamman's allegations, the remaining causes of action likewise arose from appellant's conduct in failing to act as a fiduciary in accordance with the

10

terms of the Partnership Agreement, disrupting Tamman's relationship with his clients and failing to satisfy its obligation under the Partnership Agreement to defend and indemnify him.

The principal thrust or gravamen of Tamman's claims arose from appellant's failure to honor its partnership obligations as expressed in the Partnership Agreement. Although those claims were preceded or triggered by the SEC investigation, they did not arise from it. *State Farm General Ins. Co. v. Majorino*, *supra*, 99 Cal.App.4th 974, illustrates this distinction. There, the appellants filed a personal injury action against the Catalanos alleging they were assaulted. State Farm accepted the Catalanos' tender of defense with a reservation of rights and, in turn, filed a declaratory relief action against the appellants and the Catalanos. The appellants moved to strike State Farm's action under section 425.16, arguing that it arose from the personal injury action they filed against the Catalanos. (*State Farm General Ins. Co. v. Majorino*, *supra,* at p. 976.) The appellate court rejected this argument: "Appellants' personal injury suit against the Catalanos did trigger the chain of events that caused State Farm to seek a judicial declaration of its coverage obligations. And the nature of the claims in the underlying personal injury case frames the scope of coverage under the State Farm policy. But the action for declaratory relief *arose* from the tender of defense and the terms of an insurance policy issued well before the underlying litigation commenced, not from the litigation process itself." (*Id.* at p. 977.) Likewise, while the SEC investigation triggered Tamman's complaint and framed the scope of his request for a defense and indemnification, Tamman's claims arose from the terms of the Partnership Agreement preceding the SEC investigation, not from the investigation itself.

Multiple cases recognize this distinction. (See, e.g., *Espiscopal Church Cases*, *supra*, 45 Cal.4th at pp. 477-478 [denial of special motion to strike complaint filed by local church seeking recovery of church property from larger general church from whom it disassociated, as the "fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a property dispute into a SLAPP suit"]; *Baharian-Mehr v. Smith*, *supra*, 189 Cal.App.4th at

11

pp. 272-273 [denial of special motion to strike complaint filed by one partner against partnership and other partners alleging multiple forms of mismanagement and improper spending, where allegations involving protected activity were "'only incidental' to business dispute based on nonprotected activity"]; *Hylton v. Frank E. Rogozienski, Inc.*, *supra*, 177 Cal.App.4th at p. 1272 [denial of special motion to strike breach of fiduciary claims brought by client against former attorney, where "[a]lthough petitioning activity is part of the evidentiary landscape within which [the plaintiff's] claims arose, the gravamen of [the] claims is that [the defendant] engaged in nonpetitioning activity inconsistent with his fiduciary obligations owed to [the plaintiff]"]; *Clark v. Mazgani*, *supra*, 170 Cal.App.4th at p. 1288 [denial of special motion to strike tenant's action against landlord for fraudulent eviction, where the claims arose from the landlord's fraudulently invoking an ordinance to evict the tenant and not from the landlord's filing and service of eviction notices or prosecution of an unlawful detainer action]; *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 795, 809 [denial of special motion to strike breach of contract and tort claims stemming from sale of real property where the principal thrust of the complaint challenged the manner in which the parties dealt with each other privately, finding the collateral activity of obtaining governmental approvals was merely evidence of that conduct].)

We are unpersuaded that the motion to strike should have been granted on the basis of appellant's efforts to characterize Tamman's complaint as arising from protected activity. Appellant relies primarily on *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, where the appellate court reversed the denial of a special motion to strike a complaint filed by an attorney against the administrator of a sheriffs' association legal defense fund. The attorney alleged she received fewer case referrals because of her gender. The court reasoned that "defendants' attorney selection and litigation funding decisions constitute statements or writings 'made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . .' (§ 425.16, subd. (e)(2).) As such, the decisions constitute protected speech and petitioning activities, even though they were made on

12

behalf of" sheriffs' association members and defense fund clients. (*Tuszynska v. Cunningham*, *supra*, 199 Cal.App.4th at p. 268.)

Appellant maintains its refusal to defend or indemnify Tamman was a comparable "litigation funding decision" made in connection with an official proceeding—the SEC investigation. In *Tuszynska v. Cunningham*, *supra*, 199 Cal.App.4th at pages 268 to 269, there was no dispute that the administrator's attorney selection and corresponding litigation funding decisions were protected speech and petitioning activities. The plaintiff argued, however, that her claims were not based on such activities, but rather on the administrator's discriminatory conduct. The court found no merit to this contention, explaining that the motive for the administrator's action was not determinative of whether the activity giving rise to the plaintiff's claims constituted protected speech or petitioning. (*Ibid*.) Here, conversely, appellant focuses on the motive for its actions (the SEC investigation) while ignoring that the basis for Tamman's defense and indemnification request stemmed from a pre-existing contractual obligation. Again, while the SEC investigation may have triggered Tamman's request under the Partnership Agreement, appellant's refusal to defend or indemnify Tamman was not based on the SEC investigation—the decision was based on its construction of the Partnership Agreement. (See *Copenbarger v. Morris Cerullo World Evangelism* (2013) 215 Cal.App.4th 1237, 1247 [reversing grant of special motion to strike where three-day notice preceded and triggered the sublessee's complaint against the sublessor, but the gravamen of the complaint was not based on the notice or subsequent unlawful detainer action and instead on "a dispute over the parties' respective rights and obligations under certain terms of the Ground Lease and the Sublease"]; *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1399 [reversing grant of special motion to strike complaint filed by insured against insurer alleging claims handling misconduct, rejecting argument that the allegations were based on a report filed with the Department of Insurance, as the argument confused insurer's "allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct"].)

The other two cases on which appellant relies likewise provide no assistance. Each affirmed the denial of an anti-SLAPP motion. *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809 (*Anapol*) and *Beach v. Harco National Ins. Co.* (2003) 110 Cal.App.4th 82 (*Beach*) involved the question of whether and when the submission of an insurance claim constitutes prelitigation conduct protected by section 425.16. In *Anapol*, the court acknowledged there may be circumstances where the submission of a claim is in anticipation of litigation, but concluded the moving parties failed to meet their burden to show their claims were protected prelitigation statements. (*Anapol*, *supra*, at pp. 828-829.) In *Beach*, the court held that an insurer's alleged bad faith conduct in delaying its response to and resolution of the insured's claim did not involve the right to petition. (*Beach*, *supra*, at p. 94.) Appellant relies on both cases for the proposition first articulated in *Beach* and repeated in *Anapol* that "[j]ust as a plaintiff invokes the right of petition by filing a lawsuit or seeking administrative action, a defendant, when responding to such an action, exercises the same constitutional right. [Citations.]" (*Beach*, *supra*, at pp. 93-94; see also *Anapol, supra*, at p. 826.) We reiterate that appellant's conduct in refusing Tamman's request for a defense and indemnification was not petitioning activity in response to the SEC investigation. Rather, Tamman's request stemmed from the parties' pre-existing contractual relationship, and appellant's response was likewise based on its interpretation of its rights and duties under that agreement. Because Tamman's claims did not arise from protected activity, the trial court properly denied appellant's special motion to strike.

## DISPOSITION

The order denying the special motion to strike under section 425.16 is affirmed.

Tamman is entitled to his costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


FERNS, J.*

We concur:


ASHMANN-GERST,  Acting P.J.


CHAVEZ, J.

_____

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.